**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0259n.06

Nos. 14-1360, 14-1600, 14-1717, 14-1804, 14-1839,
14-1986, 14-2094, 14-2129, 14-2249

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| **Plaintiff-Appellee,** | ) | May 12, 2016 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | ON APPEAL FROM THE |
| MATTHEW PENALOZA; RAMON | ) | UNITED STATES DISTRICT |
| GAYTAN, JR.; JOE CABRERA; JAMES | ) | COURT FOR THE WESTERN |
| GONZALES; FRANCINET CRUZ; FRANK | ) | DISTRICT OF MICHIGAN |
| CISNEROS; JOSEPH MARTINEZ; | ) | |
| FRANCISCO MARTINEZ, JR.; and JULIO | ) | **OPINION** |
| HERNANDEZ, | ) | |
| | ) | |
| **Defendants-Appellants.** | ) | |
| | ) | |

Before: SUHRHEINRICH and MOORE, Circuit Judges; LUDINGTON, District Judge.[*]

**KAREN NELSON MOORE, Circuit Judge.** These appeals arise out of a case

involving thirty-one defendants who were charged with a number of crimes related to their

membership in, and acts done on behalf of, the Holland, Michigan chapter of the organization

known as the Latin Kings. The focal point of the case, a charge under the Racketeer Influenced

and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, alleged that the Holland

Latin Kings was a criminal street gang, and that its members "engaged in acts involving murder,

arson, assault, witness tampering, obstruction of justice, drug trafficking, weapons trafficking,

---

[*]The Honorable Thomas L. Ludington, United States District Judge for the Eastern
District of Michigan, sitting by designation.

and other crimes." R. 480 (Fourth Superseding Indictment at 4) (Page ID #2141). The Indictment charged a variety of racketeering acts over the course of twenty years, as well as separate drug-distribution conspiracies, and a number of individual crimes involving firearms, violence, and obstruction of justice. The nine defendants whose appeals are addressed in this Opinion each pleaded guilty to having participated in the Holland Latin Kings racketeering conspiracy, and six of the nine also pleaded guilty to one of various drug-distribution conspiracies. On appeal, they each contest their sentences. The sentencing issues raised by each defendant relate to a variety of discrete events that occurred over the course of the twenty-year racketeering conspiracy. Because the facts related to each sentencing issue are not common to the defendants, we recite the relevant factual background in connection with our analysis of each defendant's legal arguments. For the reasons that follow, we **REMAND** Matthew Penaloza's case for consideration of his argument that the Supreme Court's recent decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015), affects his sentence. We **AFFIRM** Penaloza's sentence in all other respects, and also **AFFIRM** the sentences of all other defendants.

## I. STANDARD OF REVIEW

"[A]ppellate review of sentencing decisions is limited to determining whether they are 'reasonable,'" and this reasonableness is reviewed "under an abuse-of-discretion standard." *Gall v. United States*, 552 U.S. 38, 46, 51 (2007). "Sentences in criminal cases are reviewed for both procedural and substantive reasonableness." *United States v. Morgan*, 687 F.3d 688, 693 (6th Cir. 2012). The procedural component requires that we "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the

2

Guidelines range, treating the Guidelines as mandatory, failing to consider the [18 U.S.C.] § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall*, 552 U.S. at 51. Undertaking this review, "[t]he district court's legal interpretation[s] of the Guidelines are reviewed de novo, but its factual findings will not be set aside unless they are clearly erroneous." *United States v. Brooks*, 628 F.3d 791, 796 (6th Cir.), *cert. denied*, 131 S. Ct. 3077 (2011). The substantive component of appellate review of a sentence "take[s] into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Gall*, 552 U.S. at 51. "The sentence may be substantively unreasonable if the district court chooses the sentence arbitrarily, grounds the sentence on impermissible factors, or unreasonably weighs a pertinent factor." *Brooks*, 628 F.3d at 796. "The essence of a substantive-reasonableness claim is whether the length of the sentence is 'greater than necessary' to achieve the sentencing goals set forth in 18 U.S.C. § 3553(a)." *United States v. Tristan-Madrigal*, 601 F.3d 629, 632–33 (6th Cir. 2010).

## II. ANALYSIS

### A. Matthew Penaloza

Matthew Penaloza pleaded guilty to having participated in the Holland Latin Kings racketeering conspiracy, as well as a related conspiracy to distribute 100 kilograms or more of marijuana. *See* R. 681 (Plea Agreement at 1) (Page ID #3979). The Presentence Report ("PSR") scored Penaloza with a Base Offense Level of 26 for Count Sixteen—the marijuana conspiracy.

*See* R. 940 (PSR ¶ 902) (Page ID #8250).[1]  He received a one-level multiple-count adjustment due to a finding that he had been a felon in possession of a firearm in connection with the racketeering conspiracy.  *Id.* ¶¶ 895–98, 905–07 (Page ID #8249–50).  Penaloza also was scored for a three-level leadership enhancement, *id.* ¶ 910 (Page ID #8250–51), which was offset by a three-level reduction for acceptance of responsibility, *id.* ¶¶ 914–15 (Page ID #8251).  The PSR placed Penaloza in a Criminal History Category of VI, which produced a guidelines range of 130–162 months when combined with his Total Offense Level of 27.  *See id.* ¶¶ 933, 961 (Page ID #8259, 8263).

At sentencing, Penaloza objected to the application of the three-level leadership enhancement and the one-level multiple-count adjustment.  *See* R. 1003 (Tr. of Mar. 12, 2014 Sentencing at 4:18–22, 6:12–7:12) (Page ID #10010, 10012–13).  The district court overruled the objection to the multiple-count adjustment, and applied only a one-level leadership enhancement.  *See id.* at 8:9–17, 12:20–13:5 (Page ID #10014, 10018–19).  The district court thus applied a

---

[1]Six of the nine defendants whose appeals are addressed in this Opinion pleaded guilty to multiple charges, so the determination of their Base Offense Level was based on the Multiple Count provisions of the Sentencing Guidelines.  *See* U.S. SENTENCING GUIDELINES MANUAL ch. 3, pt. D (U.S. SENTENCING COMM'N 2013).  Those provisions provide that the district court must first group counts into "Groups of Closely Related Counts" pursuant to U.S.S.G. § 3D1.2, then "[d]etermine the offense level applicable to each Group by applying the rules specified in § 3D1.3," and finally "[d]etermine the combined level applicable to all Groups" under § 3D1.4. *Id.* § 3D1.1(a) (2013).  Penaloza's Base Offense Level was driven by his marijuana-conspiracy conviction because it had the highest Base Offense Level, and § 3D1.4 directs that "[t]he combined offense level is determined by taking the offense level applicable to the Group with the highest offense level and increasing that offense level by the [multiple-count adjustment applicable to the other Groups]."  The sentencing calculations for the five other defendants with multiple counts proceeded similarly.

Total Offense Level of 25 and Penaloza's Criminal History Category of VI, resulting in a guidelines range of 110–137 months. *See id.* at 13:4–9 (Page ID #10019). The district court sentenced Penaloza to 110 months. *Id.* at 23:1–2 (Page ID #10029). On appeal, Penaloza challenges the district court's application of a one-level leadership enhancement and the one-level multiple-count adjustment.

### 1. Leadership Enhancement

Although the district court granted Penaloza's objection to the application of a leadership enhancement in part, Penaloza argues that he should not have been assessed the one-level enhancement that the district court did apply. He focuses his argument on the fact that he served in a leadership position for only two weeks, and argues that he was not involved in any act of leading or directing another member of the Holland Latin Kings during that time.

The Sentencing Guidelines provide for a three-level leadership enhancement "[i]f the defendant was a manager or supervisor . . . and the criminal activity involved five or more participants or was otherwise extensive." U.S. SENTENCING GUIDELINES MANUAL § 3B1.1(b) (U.S. SENTENCING COMM'N 2013).[2] Although the analysis considers the number of participants in the offense, "[a] defendant only needs to be a leader of 'one or more other participants' to qualify for the enhancement." *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013) (quoting U.S.S.G. § 3B1.1 cmt. n.2). In determining whether a defendant warrants a role

---

[2]Because all nine defendants were sentenced between November 1, 2013 and November 1, 2014, their sentencing is governed by the 2013 version of the Sentencing Guidelines. *See* U.S.S.G. § 1B1.11(a) (2013) ("The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.").

enhancement of any kind, we look to "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, . . . the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *United States v. Wright*, 747 F.3d 399, 412 (6th Cir.) (quoting U.S.S.G. § 3B1.1 cmt. n.4 (2013)), *cert. denied*, 135 S. Ct. 175 (2014). Our "review of the legal conclusion that a person is an organizer or leader under Section 3B1.1 is . . . deferential." *Washington*, 715 F.3d at 983.

The district court did not err in finding that Penaloza's time-limited leadership role warranted a one-level enhancement. Penaloza admitted to having served as the co-enforcer of the East Side chapter of the Holland Latin Kings beginning on July 5, 2012. *See* R. 940 (PSR ¶¶ 169, 727) (Page ID #8144, 8225). That position gave Penaloza "responsib[ility] for the security of every member of the Chapter," "ensur[ing] the laws are enforced and carr[ying] out the orders of the Inca and Cacique"—the first and second in command of the Chapter. *Id.* ¶ 169 (Page ID #8144). Although Penaloza was an enforcer for only two weeks—his time was cut short on July 19, 2012, when he was arrested for operating a vehicle while intoxicated, *id.* ¶¶ 727, 930 (Page ID #8225, 8259)—the district court appropriately took this brevity into account in applying only a one-level enhancement. *See United States v. Jones*, 454 F.3d 642, 652 (7th Cir.) (affirming application of a two-level enhancement rather than the requested three-level enhancement, when faced with differing testimony about the length of time a defendant had served in a leadership position, because "[t]he fact that he was found to occupy the role for a

short while was reflected in the court's decision to add only two points"), *cert. denied*, 549 U.S. 1064 (2006).

There was also sufficient evidence to suggest that Penaloza actually acted as "a leader of 'one or more other participants'" during his tenure. *Washington*, 715 F.3d at 983 (quoting U.S.S.G. § 3B1.1 cmt. n.2). On July 15, 2012, Penaloza "discussed and organized a plan to retaliate against Vatos Locos members" with the chapter leader. R. 940 (PSR ¶¶ 363, 731) (Page ID #8164, 8226).[3] This is sufficient to show his "exercise of decision making authority" and "participation in planning or organizing the offense." U.S.S.G. § 3B1.1 cmt. n.4 (2013); *see also Wright*, 747 F.3d at 412–13 (affirming application of enhancement where defendant's role included introducing a participant to the conspiracy, "encourag[ing] the group to come to a 'consensus' on their plan," "suggest[ing] that the group meet 'every couple of days,' and direct[ing] other defendants to set up 'secure' email accounts and to access online forums to facilitate planning"). Under the deferential standard of review applicable to § 3B1.1 determinations, we find no error in the district court's application of a one-level leadership enhancement.

---

[3]Penaloza's related order to Rocky Solano regarding this plan cannot serve as a basis for finding that Penaloza led a participant because Rocky Solano was working as a government informant. *See United States v. Carroll*, 893 F.2d 1502, 1508–09 (6th Cir. 1990) (because law-enforcement agents are not criminally responsible, they are not "participants" in the crime, so "the government cannot claim that [a defendant] was leading or organizing government agents").

### 2. Possession of a Firearm

Penaloza also challenges the district court's imposition of a one-level multiple-count adjustment, which was premised on a finding that he was a felon in possession of a firearm during the course of the racketeering conspiracy. This finding was based on the events of July 28, 2008, which were chronicled in the Presentence Report.

On July 28, 2008, Penaloza was in a vehicle with co-defendants Frank Cisneros and Joe Cabrera, and non-party Yvonne Castanon. *See* R. 940 (PSR ¶ 732) (Page ID #8226). "Mr. Cisneros was responsible for security that night and possessed a .22 caliber handgun. Each of the individuals in the vehicle were aware of the presence of the firearm." *Id.* The car was stopped for speeding, searched, and "a loaded .22 caliber semi-automatic handgun was found under Mr. Penaloza's seat," with "the barrel of the firearm . . . pointing toward the backseat of the vehicle." R. 940 (PSR Addendum at 2) (Page ID #8268). Cabrera ultimately took responsibility for the firearm, and Penaloza was found "not guilty of being in possession of the firearm" in a hearing before a parole board. *Id.* The Presentence Report indicated, however, "that Mr. Cabrera was ordered by [Holland Latin Kings] leaders to take responsibility for the firearm, even though he was not responsible for possessing it originally" because Cisneros and Penaloza were convicted felons on parole. *Id.*

At sentencing, Penaloza claimed that the evidence was insufficient to show that he had constructive possession of the firearm that was found during the traffic stop. R. 1003 (Tr. of Mar. 12, 2014 Sentencing at 6:12–20) (Page ID #10012). The district court responded that the

8

firearm "was found under the seat that [Penaloza] was sitting on" and that "[t]he handgrip part of the gun was in the front pointing toward the back, which common sense would lead to believe that obviously the person who would have put it there would have put it under with the barrel pointing back." *Id.* at 7:13–22 (Page ID #10013). The district court therefore overruled Penaloza's objection. *See id.* at 8:9–12 (Page ID #10014).

On appeal, Penaloza asserts that the district court's findings were clearly erroneous. Although the issue is whether Penaloza was a felon in possession under U.S.S.G. § 2K2.1, cases describing possession under 18 U.S.C. § 922(g)(1) are instructive. *See United States v. Gevedon*, 214 F.3d 807, 813 (7th Cir.) ("Sentencing under [18 U.S.C. § 922] should be consistent with the statute and thus that definition must logically extend to U.S.S.G. § 2K2.1 since it is the guideline for sentencing violations of § 922."), *cert. denied*, 531 U.S. 916 (2000). "Possession can either be 'actual' or 'constructive." *United States v. Walker*, 734 F.3d 451, 455 (6th Cir. 2013) (quoting *United States v. Schreane*, 331 F.3d 548, 560 (6th Cir. 2003)). "A person who knowingly has direct physical control over a thing at a given time is then in actual possession of it," *United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009) (quoting *United States v. Frederick*, 406 F.3d 754, 765 (6th Cir. 2005)), while "[c]onstructive possession exists when a person does not have actual possession but instead *knowingly* has the power and the *intention* at a given time to exercise dominion and control over an object, either directly or through others," *id.* (quoting *United States v. Craven*, 478 F.2d 1329, 1333 (6th Cir. 1973)). "[T]he theory of constructive possession requires 'specific intent,'" *id.* at 945 (quoting *United States v. Newsom*,

9

452 F.3d 593, 606 (6th Cir. 2006)), and "[p]resence alone cannot show the requisite knowledge, power, or intention to exercise control over the . . . firearms," *id.* (quoting *United States v. Birmley*, 529 F.3d 103, 107–08 (6th Cir. 1976)).

In applying this definition of possession to appeals challenging the sufficiency of the evidence to support a conviction under § 922(g), we have held that the mere fact that a gun is located under one's seat in a vehicle is insufficient. *See Bailey*, 553 F.3d at 945–46 (evidence insufficient where "the loaded gun was found underneath [the defendant's] seat in the stolen car he was driving" and "he had attempted to evade police"). By contrast, evidence that a gun was positioned in a manner that implied a connection to the defendant has been held sufficient for constructive possession when the defendant was also observed during a traffic stop removing his seatbelt "in a manner that suggested he was 'reaching' downward towards the area where the gun was eventually found." *Walker*, 734 F.3d at 457. Accordingly, we have upheld § 922(g) convictions where some factor in addition to location alone strengthened the link to the particular defendant and thus implied the requisite intent to exercise control over the firearm. *See, e.g.*, *United States v. Arnold*, 486 F.3d 177, 180–81 (6th Cir. 2007) (en banc) (police received a 911 call that the defendant had just threatened someone with "a black handgun" and such a handgun was found "directly under the passenger seat of the car" immediately after police arrived at the scene), *cert. denied*, 552 U.S. 1103 (2008); *United States v. Murphy*, 107 F.3d 1199, 1208 (6th Cir. 1997) (firearm "was found on the seat immediately next to where the driver had been sitting," the defendant and his mother "were the only persons who knew where the gun was

10

kept," and defendant gave an "unsolicited disclaimer of the weapon").[4]  Notably, these § 922(g)

cases all addressed the sufficiency of the evidence to support a conviction.  They were therefore

presented with the question "'whether, after viewing the evidence in the light most favorable to

the prosecution, any rational trier of fact could have found the essential elements of the crime'

beyond a reasonable doubt."  *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015)

(quoting *United States v. Eaton*, 784 F.3d 298, 304 (6th Cir. 2015)).  Thus, while instructive as to

the definition of possession for purposes of U.S.S.G. § 2K2.1, the § 922(g) cases do not perfectly

illustrate the kind of evidence that is needed under the preponderance-of-the-evidence standard

applicable to § 2K2.1, especially where, as here, our review of the district court's findings is for

clear error.

The government bases its argument on the position of the gun under Penaloza's seat and

pointing toward the rear of the vehicle.  Were this a § 922(g) case challenging the sufficiency of

the evidence, that may well be insufficient.  In such a case the location and position of the

firearm could demonstrate that *at some point in time* the firearm was placed by someone sitting

in the passenger seat, but would not alone support a finding beyond a reasonable doubt as to

*when* it was placed there.  Here by contrast, under clear-error review, the positioning and

---

[4]*United States v. Liranzo*, 385 F.3d 66 (1st Cir.), *cert. denied*, 543 U.S. 1013 (2004)—
cited by the government, Appellee Br. at 126–27—is consistent with these rulings.  It involved
the added fact that the officer conducting a traffic stop saw the defendant "ma[k]e a reaching
movement underneath the seat" and the gun was then located "propped up between the seat and
the floor at a 45-degree angle."  *Liranzo*, 385 F.3d at 68.  Thus, not only was the gun in a
precarious position that implied that it had been placed there recently, but also the officer
observed the defendant (and not the other occupants of the car) reaching under the seat
immediately beforehand.  *See id.* at 69.

location of the firearm, combined with the Presentence Report's indication that Penaloza knew that the firearm was in the car that night, supports an inference by a preponderance of the evidence that Penaloza placed the firearm under his seat that evening.

### 3. Motion to Expand the Appeal

After briefing closed, Penaloza sought leave to supplement his appeal to raise a third issue in light of the Supreme Court's decision in *Johnson v. United States*, 135 S. Ct. 2551, 2563 (2015), which held that the residual clause of the Armed Career Criminal Act, 18 U.S.C. § 924(e)(2)(B), was unconstitutionally vague. Penaloza argues that he was considered to be a *felon* in possession only because of a prior conviction that has been found to be a qualifying felony under the residual clause of U.S.S.G. § 4B1.2(a). The final clause of § 4B1.2(a) uses identical language to the clause that the Supreme Court invalidated in *Johnson*. *See* 135 S. Ct. at 2555–56. This maters because Penaloza's prior conviction—Fleeing and Eluding in the Third Degree, Mich. Comp. Laws § 750.479a(1)–(3) (2012)—was treated as a crime of violence because it has been found to be one under the residual clause. *See United States v. Martin*, 378 F.3d 578, 582–83 (6th Cir. 2004). Although *Johnson* involved a statute, not the Sentencing Guidelines, we extended *Johnson* to U.S.S.G. § 4B1.2(a)(2) in *United States v. Binford*, No. 14-1635, 2016 WL 1258375, ___ F.3d ___, at *10 (6th Cir. Mar. 31, 2016). Penaloza therefore requests that we permit him "to supplement his appeal" to address this issue, or, "[i]n the alternative," that the "issue be remanded to the district court to address the same." Consistent

with our practice in other cases that were pending on appeal when *Johnson* was decided, we

**REMAND** to the district court for resolution of Penaloza's *Johnson* claim.

## B. Ramon Gaytan

Ramon Gaytan pleaded guilty to having participated in the Holland Latin Kings racketeering conspiracy, as well as a related conspiracy to distribute 100 kilograms or more of marijuana. *See* R. 717 (Plea Agreement at 1) (Page ID #4205). The Presentence Report scored Gaytan a Base Offense Level of 32 for the marijuana conspiracy. *See* R. 1041 (PSR ¶ 978) (Page ID #11156). He received a two-level firearm enhancement. *Id.* ¶ 979 (Page ID #11156). Gaytan also received a one-level multiple-count adjustment relating to allegations that he stabbed Roberto Villareal in relation to the racketeering conspiracy. *Id.* ¶¶ 935–39, 981–83 (Page ID #11151–52, 11156–57). Gaytan was scored a three-level leadership enhancement, *id.* ¶ 986 (Page ID #11157), which was offset by a three-level reduction for acceptance of responsibility, *id.* ¶¶ 989–90 (Page ID #11157). The PSR placed Gaytan in a Criminal History Category of IV, which produced a guidelines range of 235–293 months when combined with his Total Offense Level of 35. *See id.* ¶¶ 1016, 1045 (Page ID #11167, 11172).

Gaytan was involved in a marijuana-trafficking conspiracy from 2009–2012. *See id.* ¶¶ 182, 488, 758 (Page ID #11041, 11079, 11127). At that time, the Holland Latin Kings possessed jointly controlled "nation guns," *id.* ¶ 167 (Page ID # 11038), and these weapons were used by Gaytan and others for the gang's security and to retaliate against other gangs and people who were perceived to have slighted members of the Holland Latin Kings, *see id.* ¶¶ 291, 380,

383, 415–16, 431, 436, 438, 445, 452–53, 505, 507–08, 511, 524–25, 584–90, 610, 612–13, 618, 641–47, 657–58, 664–65, 687–89, 691–94, 730, 888 (Page ID #11053, 11062–63, 11068–69, 11071–74, 11082–84, 11086, 11096–97, 11101–03, 11106–07, 11109, 11111, 11115–16, 11123, 11145). Furthermore, the enforcer—a position Gaytan held for part of 2012, *id.* ¶¶ 654, 660, 676, 712, 721, 756, 925 (Page ID #11109–10, 11113, 11118–19, 11121, 11127, 11150)—was generally involved in the acquisition of nation guns. *See id.* ¶ 414 (Page ID #11068).

At sentencing, Gaytan objected to the two-level firearm enhancement on the ground that he "was never charged or found with a weapon in conjunction with any sort of the drug offenses that were listed in the indictment and that he pled guilty to." R. 1087 (Tr. of April 18, 2014 Sentencing at 4:18–21) (Page ID #11733). Gaytan's argument was that any instance of gun possession was not connected to the drug-related offense to which the sentencing enhancement was being applied. *See id.* at 5:20–6:1 (Page ID #11734–35). The district court concluded that "the gun enhancement is not designed to be selectively used in one of two counts," and therefore could be applied to calculating the Adjusted Offense Level for the drug conspiracy even if the gun was used in connection with the racketeering conspiracy. *See id.* at 10:13–11:9 (Page ID #11739–40). After granting Gaytan a downward variance, the district court sentenced him to 200 months of incarceration. *See id.* at 25:18–22 (Page ID #11754). On appeal, Gaytan objects to the district court's application of the two-level firearm enhancement.

The firearm enhancement arises pursuant to U.S.S.G. § 2D1.1(b)(1), which provides that "[i]f a dangerous weapon (including a firearm) was possessed, increase by 2 levels." The

guideline contains no explanation of when the firearm must have been "possessed" or by whom. Application Note 11 to § 2D1.1 states that "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense," and that Note has been interpreted to create a burden-shifting framework. "The government bears the burden of showing by a preponderance of the evidence that the defendant either 'actually or constructively possessed the weapon.'" *United States v. Darwich*, 337 F.3d 645, 665 (6th Cir. 2003) (quoting *United States v. Hough*, 276 F.3d 884, 894 (6th Cir. 2002)). Upon such proof, "a presumption arises that 'the weapon was connected to the offense,'" and "[t]he burden then shifts to the defendant to 'show that it was clearly improbable that the weapon was connected with the crime.'" *Id.* (quoting *Hough*, 276 F.3d at 894).

The first step has prompted some confusion over when or where the defendant must have "possessed the weapon." This confusion is the product of a 1991 amendment to the Sentencing Guidelines, which removed a prior requirement that the weapon was "possessed during the commission of the offense." *United States v. Faison*, 339 F.3d 518, 520 (6th Cir. 2003). After that amendment, we have interpreted § 2D1.1(b) to require that a firearm "was possessed" during anything that constitutes "relevant conduct" under U.S.S.G. § 1B1.3. *Id.*; *see also United States v. Clisby*, No. 14-3764, 2016 WL 106078, ___ F. App'x ___, at *3 (6th Cir. Jan. 8, 2016). Under the 2013 version of the Sentencing Guidelines applicable to Gaytan's sentencing, relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," as well as "all reasonably foreseeable

15

acts and omissions of others in furtherance of the jointly undertaken criminal activity," either of which must have "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." *Id.* § 1B1.3(a) (2013). Once it is established that a firearm was possessed during relevant conduct, the presumption discussed in *Darwich* arises, subject to the defendant's ability to show that a connection to a drug offense was clearly improbable. *See Clisby*, 2016 WL 106078, at *4. We review the district court's factual findings regarding the enhancement for clear error. *Darwich*, 337 F.3d at 664.

In Gaytan's case, the firearm enhancement resulted in a two-level increase to his Total Offense Level because that enhancement was applied to the marijuana conspiracy, not the racketeering conspiracy.[5] Gaytan's argument is that the government did not show that he possessed a gun in conjunction with *that* offense, thus removing the enhancement from the calculus. The government cites undisputed portions of the Presentence Report, but those portions do not link the gun possession and violence activity of the Holland Latin Kings directly

---

[5]This is so because the marijuana conspiracy was driving the applicable Base Offense Level pursuant to the rules for scoring multiple-count offenses under U.S.S.G. § 3D1.4. *See supra* at 4 n.1. The racketeering conspiracy—having a lower applicable offense level after including the requisite enhancements—served only to provide a potential multiple-count adjustment, in this case a one-level adjustment because the highest applicable offense level under the racketeering conspiracy was between five and eight levels lower than the offense level applicable to the marijuana conspiracy. *See* U.S.S.G. § 3D1.4(b) (2013). Accordingly, the district court's suggestion that a firearm enhancement applicable to the racketeering conspiracy could equally be applied to the marijuana conspiracy was not correct. A two-level enhancement to the racketeering Offense Level could have served only to affect the applicable multiple-count adjustment under U.S.S.G. § 3D1.4.

16

to their drug-trafficking activities. *See* Appellee Br. at 193–94. Nonetheless, the facts presented to the district court make out a basis for the court's conclusion. The Presentence Report included instances of both actual and constructive possession by Gaytan during the time period relevant to the marijuana conspiracy. *See supra* at 13–14. Although the firearms events were not linked directly to the protection of the Holland Latin Kings's drug activities, they all related to the protection of the Holland Latin Kings enterprise, *id.*, a main object of which was drug trafficking. The members of the marijuana conspiracy were also all members of the racketeering conspiracy. It was therefore not clearly erroneous to find the weapon possession to have been relevant conduct to the marijuana conspiracy, having occurred "during the commission of the offense." U.S.S.G. § 1B1.3(a) (2013). These facts therefore give rise to a presumption "that 'the weapon was connected to the offense,'" and Gaytan has not "'show[n] that it was clearly improbable that the weapon was connected with the crime,'" *Darwich*, 337 F.3d at 664 (quoting *Hough*, 276 F.3d at 894). Accordingly, the district court did not err in applying the firearm enhancement.

## C. Joe Cabrera

Joe Cabrera pleaded guilty to having participated in the Holland Latin Kings racketeering conspiracy. *See* R. 754 (Plea Agreement at 1) (Page ID #4610). The Presentence Report gave Cabrera a Base Offense Level of 27 due to racketeering activity underlying the conspiracy— specifically, an assault with the intent to murder Ross LeHockey. *See* R. 1136 (PSR ¶ 961) (Page ID #12934). Cabrera was scored a four-level enhancement because LeHockey sustained

life-threatening injuries. *See id.* ¶ 962 (Page ID #12934). Cabrera was also scored a three-level multiple-count adjustment due to other racketeering acts underlying the racketeering conspiracy, *id.* ¶¶ 986–88 (Page ID #12936–37), and a three-level reduction for acceptance of responsibility, *id.* ¶¶ 994–95 (Page ID #12937). The Report placed Cabrera in a Criminal History Category of III, which produced a guidelines range of 135−168 months when combined with his Total Offense Level of 31. *See id.* ¶¶ 1009, 1062 (Page ID #12941, 12949).

At sentencing, Cabrera's attorney objected to the scoring of the Ross LeHockey assault, which drove the calculation of the applicable Base Offense Level. After the district court overruled the objection, R. 1164 (Tr. of May 29, 2014 Sentencing at 6:14–15) (Page ID #13623), Cabrera argued for a variance, relying on his withdrawal from the Latin Kings in 2009, *id.* at 11:21–13:24 (Page ID #13628–30). The district court varied downward and imposed a sentence of 106 months, in recognition of Cabrera's withdrawal from the conspiracy. *See id.* at 23:11−18 (Page ID #13640). On appeal, Cabrera argues that the district court should not have considered the Ross LeHockey stabbing to be relevant conduct and that his sentence is substantively unreasonable.

### 1. Ross LeHockey Stabbing

The Ross LeHockey incident appears to have begun with a dispute between LeHockey's wife and Cabrera's sister in a bar. *See* R. 1136 (PSR ¶¶ 243–44) (Page ID #12824). LeHockey and his wife "left the bar to get away from the incident but were followed into a gas station parking lot by the group of assailants." *Id.* ¶ 243 (Page ID #12824). The group consisted of the

individual "who had assaulted his wife" as well as "four other females and two men," who were later identified as "Latin Queens" and "Latin Kings," including Joe Cabrera and Nicholas Bernal, *id.* ¶¶ 244–45 (Page ID #12824). The group began assaulting LeHockey's wife and when LeHockey "knelt down next to his wife to protect her," he "was stabbed in the back several times." *Id.* ¶ 244 (Page ID #12824). Cabrera later admitted to stabbing Ross LeHockey multiple times, and explained that "the bouncers knew the Latin Kings and they were not patted down prior to entering the bar," and that "[h]e and Nick Bernal followed Ross LeHockey to a nearby gas station." *Id.* ¶¶ 760–61 (Page ID #12904).

At sentencing, Cabrera's attorney raised a series of objections regarding this event. He began by objecting "to the categorization of the stabbing of Ross LeHockey as an attempted murder rather than an aggravated assault." R. 1164 (Tr. of May 29, 2014 Sentencing at 3:22–24) (Page ID #13620). After the government cited portions of the Presentence Report that it felt supported calling the attack an attempted murder, *id.* at 4:8–5:9 (Page ID #13621–22), Cabrera's attorney shifted to the contention that "[i]t had nothing to do with the Latin Kings at the time," *id.* at 5:12–15 (Page ID #13622), but he then moved back to arguing that there was no intent to murder, *see id.* at 5:16–24, 6:9–13 (Page ID #13622–23).

On appeal, Cabrera argues that the district court erred in "using an unrelated crime as a predicate offense under 1962(d)." Cabrera Appellant Br. at 12. Cabrera confuses what it takes to prove a substantive RICO offense with how one calculates the sentence for someone convicted of a racketeering conspiracy. The substantive RICO offense requires proof of "(1) the conduct

(2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997). The "pattern of racketeering activity" requires proof of "at least two acts of racketeering activity," 18 U.S.C. § 1961(5), and the cases on which Cabrera relies were addressing the issue of when an alleged racketeering act is too far afield to support the existence of a pattern of racketeering, *see H.J. Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 240 (1989); *United States v. Diaz*, 176 F.3d 52, 93 (2d Cir.), *cert. denied*, 528 U.S. 875 (1999); *United States v. Minicone*, 960 F.2d 1099, 1106 (2d Cir.), *cert. denied*, 503 U.S. 950 (1992), but Cabrera pleaded guilty and does not contest the validity of his plea. His point seems instead to be that the Ross LeHockey stabbing was too far afield of the racketeering conspiracy to be considered *relevant conduct* for sentencing purposes. Cabrera admits that "this specific issue does not appear in the record below," but states that "it was raised with pre-trial and discussed at length during the presentencing phase with the probation department and the government," and therefore should be reviewed de novo. Cabrera Appellant Br. at 12. This is incorrect. "A party may preserve a claim of error by informing *the court*—when the court ruling or order is made or sought—of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection." Fed. R. Crim. P. 51(b) (emphasis added). Cabrera did not inform the district court of this argument, so we may review only for plain error. Cabrera must therefore demonstrate: "(1) error (2) that 'was obvious or clear,' (3) that 'affected defendant's substantial rights' and (4) that 'affected the fairness, integrity, or public reputation of the judicial

proceedings.'" *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir.) (en banc) (quoting *United States v. Gardiner*, 463 F.3d 445, 459 (6th Cir. 2006)), *cert. denied*, 555 U.S. 816 (2008).

The district court did not plainly err in finding the LeHockey stabbing to be relevant conduct. Relevant conduct includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . during the commission of the offense of conviction," U.S.S.G. § 1B1.3(a)(1) (2013), and it need be found only by a preponderance of the evidence, *United States v. Corrado*, 227 F.3d 528, 542 (6th Cir. 2000). The fact that the stabbing occurred during the racketeering conspiracy may not be sufficient alone for a finding that it was relevant because "[o]ne criminal act does not become 'relevant' to a second act under the Guidelines by the bare fact of temporal overlap." *United States v. Wernick*, 691 F.3d 108, 115 (2d Cir. 2012). But the similarities extend further in this case. The attack involved coordination among Holland Latin Kings (Cabrera and Nick Bernal, along with others identified as "Latin Queens"), and it was a violent response to a perceived slight or threat against a family member of one of those Latin Kings, in keeping with the indictment's charge that the enterprise sought to "enhanc[e] the authority, reputation, and standing of the [Holland Latin Kings] through the use of intimidation[ and] threats." R. 480 (Fourth Superseding Indictment at 4) (Page ID #2141). Given that an object of the Holland Latin Kings enterprise was responding violently to slights and threats to its members—even if those slights and threats were not related to the Holland Latin Kings's drug-dealing activities or its territory—it was not plain error to consider the attack to be relevant conduct to the Holland Latin

Kings racketeering conspiracy. *Cf. United States v. Mouzone*, 687 F.3d 207, 213, 220–21 (4th Cir. 2012) (finding no clear error in district court's determination that a murder "to avenge another [gang] member" was relevant conduct to a gang-related racketeering conspiracy where the victim had testified against the fellow gang member), *cert. denied*, 133 S. Ct. 899 (2013).[6]

### 2. Substantive Reasonableness

Cabrera's second argument is that the district court imposed a substantively unreasonable sentence by not varying downward even further than it did in recognition of Cabrera's withdrawal from the conspiracy and other post-offense rehabilitation. Having received a below-guidelines sentence, Cabrera faces an uphill battle. "Although it is not impossible to succeed on a substantive-reasonableness challenge to a below-guidelines sentence, defendants who seek to do so bear a heavy burden." *United States v. Greco*, 734 F.3d 441, 450 (6th Cir. 2013). Cabrera's argument relies on the same post-sentence conduct that the district court considered and relied upon as the basis for its decision to grant a variance. *See* R. 1164 (Tr. of May 29, 2014 Sentencing at 23:11–18) (Page ID #13640). The decisions Cabrera cites in support of his argument merely affirmed a district court's decision to vary downward significantly based upon post-offense rehabilitation, but none provide authority for his position that a decision to vary more modestly is substantively unreasonable. *See Gall*, 552 U.S. at 56; *United States v. Shy*, 538 F.3d 933, 938 (8th Cir. 2008), *cert. denied*, 556 U.S. 1160 (2009); *United States v. Martin*,

---

[6]Cabrera raised for the first time in his reply brief the argument on which he focused before the district court—that the LeHockey attack should not have been scored as an attempted murder. *See* Cabrera Reply Br. at 5–6. This argument was forfeited when he did not raise it in his opening brief. *See, e.g.*, *Wright v. Holbrook*, 794 F.2d 1152, 1156 (6th Cir. 1986).

520 F.3d 87, 93–96 (1st Cir. 2008); *United States v. Beach*, 275 F. App'x 529, 532–35 (6th Cir. 2008) (per curiam). Cabrera's argument that the district court should have given even more weight to his post-offense rehabilitation is simply an argument that we should balance the § 3553(a) factors differently than the district court did. In reviewing sentencing decisions, however, we are not authorized "to simply balance the § 3553(a) factors differently than the lower court." *United States v. Smith*, 564 F. App'x 200, 205 (6th Cir. 2014) (citing *United States v. Sexton*, 512 F.3d 326, 332 (6th Cir. 2008)).

## D. James Gonzales

James Gonzales pleaded guilty to participating in the Holland Latin Kings racketeering conspiracy. *See* R. 752 (Plea Agreement at 1) (Page ID #4598). His Presentence Report scored him at a Base Offense Level of 28, due to an underlying racketeering act involving the distribution of between 2 and 3.5 kilograms of cocaine. R. 1116 (PSR ¶ 935) (Page ID #12394). Gonzales was scored a two-level firearm enhancement, *id.* ¶ 936 (Page ID #12394), as well as a three-level leadership enhancement, *id.* ¶ 943 (Page ID #12394–95). Finally, he received a three-level reduction for acceptance of responsibility. *See id.* ¶¶ 944–47 (Page ID #12395). The Report placed Gonzales in a Criminal History Category of II, which produced a guidelines range of 108–135 months when combined with his Total Offense Level of 30. *See id.* ¶¶ 963, 1001 (Page ID #12400, 12406). Gonzales's Total Offense Level was later revised to 35, after he "attempt[ed] to impede or obstruct justice" and thereby lost his acceptance-of-responsibility reduction and gained a two-level enhancement for obstruction of justice under U.S.S.G. § 3C1.1.

*See* R. 1154 (Suppl. PSR at 1, 3–4) (Page ID #13111, 13113–14). This produced a guidelines range of 188–235 months. *See id.* at 4 (Page ID #13114).

At sentencing, Gonzales's attorney indicated that Gonzales had "no objections to the scoring of the final presentence report." R. 1243 (Tr. of June 17, 2014 Sentencing at 3:14–17) (Page ID #16072). Gonzales's attorney argued for a variance, referencing repeatedly the fact that Gonzales had previously served sentences in state court for conduct related to the racketeering conspiracy. *See id.* at 5:4–9, 6:11–16 (Page ID #16074). The district court expressed doubt when Gonzales's attorney stated that the sentence Gonzales had served was for "the same conduct [to] which the relevant conduct scoring this case would apply," noting that "[t]he state conduct was for actions taken in a particular criminal episode" while this case "is for the continuing enterprise of which that was just a small part." *Id.* at 6:15–20 (Page ID #16075). Gonzales's attorney responded "the way I would read the guidelines and my motion for variance, I would like the Court to consider at least in part if not all of his incarceration in a state facility for a long term of his life." *Id.* at 7:18–21 (Page ID #16076). Before imposing Gonzales's sentence, the district court also mentioned that "a large percentage of the time he spent in state prison was because he violated parole, and had he not violated parole, he would not have had those prison terms." *Id.* at 13:6–9 (Page ID #16082). The district court then sentenced Gonzales to 200 months of incarceration. *See id.* at 15:3–7 (Page ID #16084).

On appeal, Gonzales argues that the district court erred in refusing his request for a downward departure or variance pursuant to U.S.S.G. § 5K2.23.[7] Section 5K2.23 provides:

> A downward departure may be appropriate if the defendant (1) has completed serving a term of imprisonment; and (2) subsection (b) of § 5G1.3 . . . would have provided an adjustment had that completed term of imprisonment been undischarged at the time of sentencing for the instant offense.

U.S.S.G. § 5K2.23 (2013). Section 5G1.3(b), in turn, *currently* would provide for an adjustment in cases involving "a term of imprisonment [that] resulted from another offense that is relevant conduct to the instant offense of conviction." U.S.S.G. § 5G1.3(b) (2015). Although not mentioned by either party, § 5G1.3 was materially different prior to November 1, 2014.[8] Then, it provided for an adjustment in cases involving "a term of imprisonment [that] resulted from another offense that is relevant conduct to the instant offense of conviction . . . *and that was the basis for an increase in the offense level for the instant offense under Chapter Two (Offense Conduct) or Chapter Three (Adjustments)*." U.S.S.G. § 5G1.3(b) (2013) (emphasis added). Under this version of the Guidelines, a defendant seeking a § 5K2.23 departure based upon a fully discharged sentence "cannot qualify for a downward departure for his discharged sentence"

---

[7]In fact, Gonzales never invoked § 5K2.23 or mentioned seeking a departure to the district court. All he did was ask for a variance "because the conduct for which he had actually stood convicted in the state court is the same conduct for which the relevant conduct scoring in this case would apply and does apply." R. 1243 (Tr. of June 17, 2014 Sentencing at 6:13–16) (Page ID #16075).

[8]Gonzales was sentenced on June 17, 2014, and "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11(a) (2013).

when "the state crimes . . . were not a basis for increasing his offense level." *United States v. Carpenter*, 359 F. App'x 553, 558 (6th Cir. 2009).

That is precisely the situation in which Gonzales stands. He was held responsible in his presentence report for a 2003 assault of Jose Velez, for which he had been sentenced to between 4 and 10 years in prison. *See* R. 1116 (PSR ¶ 959) (Page ID #12399). The Velez assault was treated as relevant conduct for the racketeering conspiracy and was scored as an aggravated assault that caused life-threatening injury, giving it an Adjusted Offense Level of 21. *See id.* ¶¶ 917–19 (Page ID #12392). But this scoring had *no effect* on the calculation of his ultimate sentence, which was based on the higher Adjusted Offense Level applicable to the drug-related racketeering conduct, and was not increased by any adjustment that considered the Velez assault. *See id.* ¶¶ 935–41 (Page ID #12394). Moreover, as relevant conduct, the Velez assault could not contribute to the calculation of Gonzales's Criminal History, either. *See* U.S.S.G. § 4A1.2(a)(1) (2013). Accordingly, under the then-existing version of the Guidelines, Gonzales was ineligible for a § 5K2.23 departure. *See Carpenter*, 359 F. App'x at 558.[9]

---

[9]To the extent that Gonzales challenges the district court's decision to deny the argument that he did make at sentencing—that the prior state sentence justified a variance—the district court gave reasons that were not clearly erroneous: (1) the state sentences related to a different set of criminal activity ("a particular criminal episode," rather than "the continuing enterprise"), *id.* at 6:13–7:11 (Page ID #16075–76); (2) Gonzales's "leadership positions throughout this gang activity, and [the fact that] he didn't go to prison for leadership positions," *id.* at 6:21–22 (Page ID #16075); and (3) much of the state sentence related to parole violations, *see id.* at 13:4–11 (Page ID #16082).

### E. Francinet Cruz

Francinet Cruz pleaded guilty to participating in the Holland Latin Kings racketeering conspiracy, as well as a separate conspiracy to possess with the intent to distribute 500 grams or more of cocaine. *See* R. 775 (Plea Agreement at 1) (Page ID #4666). Cruz was scored a Base Offense Level of 32 in connection with the cocaine conspiracy, holding him responsible for between 5 and 15 kilograms of cocaine. R. 1160 (PSR ¶ 922) (Page ID #13427). Cruz received a two-level firearm enhancement, *id.* ¶ 923 (Page ID #13427), a one-level multiple-count adjustment, *id.* ¶¶ 925–27 (Page ID #13427), and a three-level leadership enhancement, *id.* ¶ 930 (Page ID #13428). Cruz was also scored a three-level reduction for acceptance of responsibility. *See id.* ¶¶ 933–34 (Page ID #13428). The Presentence Report assessed Cruz a Criminal History Category of IV, a Total Offense Level of 35, and a guidelines range of 235–293 months. *See id.* ¶¶ 968, 1021 (Page ID #13436, 13444).

At sentencing, Cruz's attorney did not object to the Presentence Report. *See* R. 1276 (Tr. of June 26, 2014 Sentencing at 3:12–22) (Page ID #17762). In his sentencing memorandum, Cruz sought a downward variance based upon five arguments: (1) that he served a three-year sentence for gang-related activity in Texas; (2) that he was in a leadership role for less than two months; (3) that his congenital medical condition seriously affected his development and continues to affect him; (4) that he was neglected and abused during childhood; and (5) that his criminal history included a number of juvenile convictions. *See* R. 1208 (Sentencing Memo at 3–7) (Page ID #13843–47); R. 1209 (Motion for Variance at 1–2) (Page ID #13850–51). He also

argued that a then-pending Amendment to the Sentencing Guidelines would soon require a two-level reduction. *See* R. 1208 (Sentencing Memo at 8) (Page ID #13848). Cruz reiterated many of these arguments at sentencing. *See* R. 1276 (Tr. of June 26, 2014 Sentencing at 5:1–10:20) (Page ID #17764–69).

The district court rejected Cruz's argument regarding the short time period during which he was a leader because "there was a lot of damage done during that particular period of time, and this is kind of a past history as well as some other things here." *Id.* at 18:19–23 (Page ID #17777). The district court also specifically asked Cruz's attorney about Cruz's medical condition, explaining that the court was "very concerned about that." *See id.* at 4:10–17 (Page ID #17763). Later, the district court also accepted Cruz's argument regarding the state sentence he had served, giving him credit for it. *See id.* at 18:24–19:7 (Page ID #17777–78). The district court did not explain why Cruz's medical issues did not warrant a variance, nor did it pronounce reasons for refusing to grant a variance based on Cruz's childhood or the alleged overstating of his criminal history. The district court recited briefly the circumstances of Cruz's offense:

> You're a longstanding Holland Latin King member since 1996. You were part of the gang in a very real way with the assaults upon Solano and Cipriano Gonzales, Sr., vicious, vicious assaults. You kind of kept some of the nation's guns with obliterated serial numbers. You were involved in a number of drive-by shootings and distribution of cocaine and marijuana in 2005 and other times, over 500 grams of cocaine that you were privy to in that conspiracy.

*Id.* at 18:11–18 (Page ID #17777). The district court concluded:

> I have to impose a sufficient sentence, but not greater than necessary to comply with Section 3553(a), looking at the nature and circumstances of this conspiracy and looking at your history and characteristics, reflecting the seriousness of this behavior and the lack of respect for law which is just profound here. A just

> punishment must also be an adequate deterrence to criminal conduct. So therefore, it appears to this Court that a sentence that is at the bottom of the guideline range, 235 months on Count 1, 235 on Count 2, but concurrent, with the credit given for one year and seven months, which . . . would be 19 months of credit given against that together with the time you've served, which I see is 26 months.

*Id.* at 19:8–21 (Page ID #17778). On appeal, Cruz argues that the district court failed to respond to many of his sentencing arguments, making his sentence both procedurally and substantively unreasonable.

"A district court commits a significant and reversible procedural error by 'failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence.'" *United States v. Gapinski*, 561 F.3d 467, 473 (6th Cir. 2009) (quoting *Gall*, 552 U.S. at 51). "In order for a district court's sentencing determination to be procedurally reasonable, a 'sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decisionmaking authority.'" *Id.* at 474 (quoting *Rita*, 551 U.S. at 356). "The question in each case 'is whether the record makes clear that the sentencing judge listened to each argument, considered the supporting evidence, was fully aware of the defendant's circumstances and took them into account in sentencing him.'" *Id.* (quoting *Vonner*, 516 F.3d at 387) (alteration omitted). "A court's failure to address each argument 'head-on' will not lead to automatic vacatur, and 'we will vacate a sentence only if the context and the record do not make clear the court's reasoning.'" *United States v. Taylor*, 696 F.3d 628, 634 (6th Cir.

2012) (quoting *United States v. Liou*, 491 F.3d 334, 339 n.4 (6th Cir. 2007)) (alterations omitted). Cruz admits that he did not object to this alleged procedural error at sentencing, Cruz Appellant Br. at 7–8, so we review for plain error.[10]

As the government asserts, the district court specifically addressed some of Cruz's points. Only the medical issues, childhood history, and alleged overstating of Cruz's criminal history were not addressed when the district court denied Cruz's request for a variance.[11] The government argues that the failure to address each argument was not plain error because the district court conducted a colloquy with Cruz about his gang and criminal history and discussed the seriousness of the offense, R. 1276 (Tr. of June 26, 2014 Sentencing at 18:11–18) (Page ID #17777), along with the fact that Cruz's Criminal History Category would not have been altered even if the juvenile offenses had been excised from consideration, Appellee Br. at 188–90. Although the district court gave no explanation of why it would not vary based upon Cruz's medical issues and childhood history, it did explain why the nature and circumstances of the offense justified a sentence within, but at the low-end of, the guidelines range. *See* R. 1276 (Tr.

---

[10]Cruz seeks to repackage the same argument into one regarding substantive reasonableness, Cruz Appellant Br. at 10–12, but the argument that a district court did not respond to particular arguments made by a defendant falls within the realm of procedural reasonableness only. *See United States v. Rosenbaum*, 585 F.3d 259, 267 (6th Cir. 2009), *cert. denied*, 558 U.S. 1136 (2010).

[11]The district court also did not address Cruz's request for a variance based upon the then-pending two-level reduction to the drug-quantity tables of the Sentencing Guidelines, but, as the government asserts, the proper venue for such an argument is a motion under 18 U.S.C. § 3582(c). *See* Appellee Br. at 191. Cruz has filed such a motion, which is pending before the district court. *See* R. 1434 (Cruz § 3582 Motion) (Page ID #20912)

of June 26, 2014 Sentencing at 18:11–19:17) (Page ID #17777–78). We have held that when a particular argument is not addressed by a district court, a sentence should still be affirmed where "[i]t is clear from the record that the district court believed a Guidelines sentence was required" due to the nature of the offense. *See Taylor*, 696 F.3d at 635. Because the district court created such a record, its failure to address each of Cruz's arguments in support of a variance was not plain error. We reiterate our view that we expressed in *Taylor*: "The district judge would have done well to expressly mention" his evaluation of the various arguments for variance presented by Cruz. *See id.*

## F. Frank Cisneros

Frank Cisneros pleaded guilty to participating in the Holland Latin Kings racketeering conspiracy. *See* R. 680 (Plea Agreement at 1) (Page ID #3968). Cisneros was scored in his Presentence Report with a Base Offense Level of 32, in view of underlying racketeering acts making Cisneros responsible for 5 kilograms of cocaine and 550 pounds of marijuana. R. 1125 (PSR ¶ 870) (Page ID #12736–37). He received a two-level firearm enhancement, *id.* ¶ 871 (Page ID #12737), and a three-level leadership enhancement, *id.* ¶ 874 (Page ID #12737). Finally, Cisneros was scored a three-level reduction for acceptance of responsibility. *See id.* ¶¶ 878–79 (Page ID #12737). With Cisneros's Criminal History Category of V and Total Offense Level of 34, the applicable guidelines range was 235–293 months. *See id.* ¶¶ 898, 945 (Page ID #12745, 12753–54). The statutory maximum on Count 1 was 20 years, 18 U.S.C.

31

§ 1963(a), so the guideline range became 235–240 months, *see* R. 1125 (PSR ¶¶ 944–45) (Page ID #12753–54).

At sentencing, Cisneros argued that his criminal-history calculation overstated the seriousness of his record, and the district court agreed to reduce the Category to IV. *See* R. 1303 (Tr. of July 24, 2014 Sentencing at 8:5–9:13) (Page ID #18729–30). This reduced the applicable guidelines range—as capped by the 20-year statutory maximum—to 210–240 months. *See* U.S.S.G. ch. 5, pt. A (2013). Cisneros then argued for a variance based primarily on his withdrawal from the gang from 1999–2008. *See* R. 1303 (Tr. of July 24, 2014 Sentencing at 10:12–22) (Page ID #18731). The district court questioned his attorney regarding Cisneros's subsequent involvement in Holland Latin Kings drug dealing in 2010, 2011, and 2012, *id.* at 11:6–12:8 (Page ID #18732–33), and noted that Cisneros's second withdrawal from the gang did not come until 2012, *id.* at 14:13–23 (Page ID #18735). Cisneros spoke during sentencing, emphasized his more sporadic involvement with the Holland Latin Kings after 1999, confirmed that he became involved once more beginning in 2008, and admitted to holding "leadership positions as an inca . . . in the '90s." *See id.* at 18:14–24:17 (Page ID #18739–45).

In pronouncing Cisneros's sentence, the district court discussed competing factors. On the one hand, Cisneros was "a longstanding member here of the Holland Latin Kings" with "a record of leadership positions on the Crown Council and casinca of the East Side chapter" and significant involvement in drug trafficking and violence. *Id.* at 34:11–21 (Page ID #18755). On the other, the district court recognized that "there was a period of time when he was in the state

32

prison system until he came back into the system and rejoined his brothers and continued on as late as approximately two years ago." *Id.* at 34:22–25 (Page ID #18755). But, it emphasized, Cisneros's "coming back and voluntarily going back into it, attending servicios and whatever else, and getting himself involved in the business of the gang both in drugs and in the violence that was attendant to the community is serious." *Id.* at 35:3–7 (Page ID #18756). Cisneros's subsequent change in the two years preceding sentencing was "impressive," but "this Court can't say, Oh, we'll just forget about this history." *Id.* at 35:10–11 (Page ID #18756). Accordingly, the district court concluded "that a sentence that is at the bottom" of the guideline range "will serve the interests of the public and balances the good aspects here that have been presented to the Court by the reduction of the final criminal record with the wrongfulness over this period of time." *Id.* at 36:1–6 (Page ID #18757). The district court sentenced Cisneros to 210 months of incarceration. *Id.* at 36:6 (Page ID #18757). On appeal, Cisneros argues that his sentence is substantively unreasonable, that he should not have been assessed the leadership and firearms enhancements, and that his counsel was constitutionally ineffective for failing to contest the applicability of those enhancements.

### 1. Substantive Reasonableness

Cisneros argues that his sentence was substantively unreasonable because the district court failed properly to weigh the following factors: (1) his post-offense rehabilitation, including withdrawing from the Latin Kings in 2012, abstaining from drugs and alcohol, and engaging in various community-service activities; (2) his withdrawal from the Holland Latin Kings for many

years before that; (3) the disparity between his sentence and that of certain average nationwide sentences; (4) the relatively minimal involvement he had in the overall racketeering offense; (5) the reduced risk of recidivism due to Cisneros's age; and (6) research showing that longer sentences do not have a stronger deterrent effect.

"A sentence within the properly calculated Guidelines range is afforded 'a rebuttable presumption of reasonableness.'" *United States v. Berry*, 565 F.3d 332, 341 (6th Cir.) (quoting *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006)), *cert. denied*, 558 U.S. 906 (2009). "'[T]he presumption of reasonableness merely reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, both the sentencing judge and the Sentencing Commission will have reached the same conclusion as to the proper sentence in the particular case.'" *Id.* (quoting *United States v. Wilms*, 495 F.3d 277, 281 (6th Cir. 2007)).

Cisneros correctly cites decisions recognizing that post-offense rehabilitation can be an appropriate basis for a downward variance. *E.g.*, *Pepper v. United States*, 131 S. Ct. 1229, 1236 (2011). But these decisions arose in a very different posture—affirming a district court's decision that post-offense rehabilitation was a basis for a downward variance. The *Pepper* line of decisions "nowhere holds that courts *must* consider post-sentence conduct." *United States v. Butler*, 443 F. App'x 147, 153 (6th Cir. 2011). In any event, the district court *did* consider Cisneros's post-offense rehabilitation, as well as his withdrawal from the Latin Kings between 1999 and 2008. *See* R. 1303 (Tr. of July 24, 2014 Sentencing at 11:6–12:8, 14:13–23, 34:11–35:23) (Page ID #18732–33, 18735, 18755–56). That it did not credit that conduct as much as

Cisneros would like is not a basis for reversal, as we are not empowered "to simply balance the § 3553(a) factors differently than the lower court." *Smith*, 564 F. App'x at 205 (citing *Sexton*, 512 F.3d at 332).

Cisneros's other arguments similarly serve only to rebalance the § 3553(a) factors. He asserts that the district court failed to consider nationwide sentencing disparities, but did not raise the issue before the district court, and the district court's consideration of the Sentencing Guidelines provides sufficient consideration of the consistency of Cisneros's sentence with other sentences for similar conduct nationwide. *See United States v. Simmons*, 501 F.3d 620, 626 (6th Cir. 2007) ("National uniformity may be particularly important when a particular crime statutorily allows for a severe punishment but it has not been imposed in similar cases, or when a particular crime is especially rampant or has a quality that is encouraging more strict sentences across the board. Otherwise, national uniformity is generally taken into account by the Sentencing Guidelines, which 'are almost certainly the best indication of ordinary practice since most sentences are within the guidelines.'" (quoting *United States v. Saez*, 444 F.3d 15, 19 (1st Cir. 2006))). Cisneros also argues that his involvement in the offense was minimal, but the district court spent a significant portion of the sentencing hearing clarifying the precise nature of Cisneros's involvement in the Holland Latin Kings over time. *See* R. 1303 (Tr. of July 24, 2014 Sentencing at 11:6–12:8, 18:14–24:17, 34:11–35:11) (Page ID #18732–33, 18739–45, 18755–56). This argument, along with his claims regarding the reduced risk of recidivism among older offenders and the weak deterrent value of long sentences, does not show that the sentence "was

arbitrary, based on impermissible factors, made without consideration of pertinent § 3553(a) factors, or made after giving an unreasonable amount of weight to any particular factor. *United States v. Love*, 392 F. App'x 410, 413 (6th Cir. 2010) (per curiam). Rather, they are mere assertions "that the district court should have balanced the § 3553(a) factors differently." *Id.* at 413–14.

### 2. Leadership and Weapons Enhancements

In advance of sentencing, Cisneros's counsel objected to the Presentence Report's application of a two-level firearms enhancement pursuant to U.S.S.G. § 2D1.1. *See* R. 1124 (Sentencing Memo at 2–3) (Page ID #12572–53). At sentencing, he withdrew that objection:

> [W]e're withdrawing our objection to that section because in that paragraph my client would admit at the time he was doing security of this house that he did have access to a firearm. It was not in his pocket or anything, but it was close by if he needed to have access, dominion or control over it.

R. 1303 (Tr. of July 24, 2014 Sentencing at 4:16–25) (Page ID #18725). Cisneros never objected to the application of the three-level leadership enhancement under U.S.S.G. § 3B1.1. Cisneros now argues that those enhancements were improperly applied and that his counsel was constitutionally ineffective for failing to challenge them.

We decline to hear the ineffective-assistance claim in this direct appeal from Cisneros's sentence. "In general, we do not review ineffective-assistance-of-counsel claims on direct appeal because 'there has not been an opportunity to develop and include in the record evidence bearing on the merits of the allegations.'" *United States v. Varner*, 598 F. App'x 389, 391 (6th Cir. 2015) (quoting *United States v. Franco*, 484 F.3d 347, 354–55 (6th Cir. 2007)). Although there

is "an exception to this general rule" that permits "review [of] an ineffective-assistance-of-counsel claim on direct appeal where 'the record is adequately developed to allow the court to properly assess the merits of the issue,'" *United States v. Williams*, 612 F.3d 500, 508 (6th Cir.) (quoting *United States v. Fortson,* 194 F.3d 730, 736 (6th Cir. 1999)), *cert. denied*, 562 U.S. 944 (2010), that exception generally does not apply when the record leaves little "window into defense counsel's thought process," *United States v. Levenderis*, 806 F.3d 390, 402 (6th Cir. 2015). We therefore decline to review Cisneros's ineffective-assistance claim because the record is thin regarding counsel's decision to withdraw the objection to the firearms enhancement and to fail to object to the leadership enhancement.

Turning to Cisneros's direct-appeal challenge to the application of both enhancements, we would normally review for plain error because of Cisneros's failure to object below. *See Vonner*, 516 F.3d at 486. The government, however, contends that even plain-error review is not applicable because Cisneros has waived his challenges.

We agree with respect to the firearms enhancement because Cisneros affirmatively withdrew his objection to that enhancement. *See* R. 1303 (Tr. of July 24, 2014 Sentencing at 4:16–25) (Page ID #18725). Withdrawing an objection results in the waiver of that objection on appeal. *See United States v. Hall*, 373 F. App'x 588, 592 (6th Cir.), *cert. denied*, 562 U.S. 928 (2010); *cf. United States v. Sheppard*, 149 F.3d 458, 461 (6th Cir. 1998) (withdrawal of a motion to suppress constitutes a waiver). Accordingly, we may not review Cisneros's challenge to the firearms enhancement.

Cisneros did not waive his challenge to the leadership enhancement, however. He never objected to it before the district court, and "[a] defendant's failure to object to a sentencing error, or even his acknowledgment that he has no objection, does not amount to a waiver of that error." *United States v. Mabee*, 765 F.3d 666, 671 (6th Cir. 2014). Cisneros merely "fail[ed] to make the timely assertion of a right," which amounts only to forfeiture. *United States v. Olano*, 507 U.S. 725, 733 (1993). We therefore review Cisneros's challenge to the application of a leadership enhancement for plain error, which requires Cisneros to demonstrate that there was "(1) error (2) that 'was obvious or clear,' (3) that 'affected defendant's substantial rights' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'" *Vonner*, 516 F.3d at 386 (quoting *Gardiner*, 463 F.3d at 459).

The district court's application of the leadership enhancement was not plain error. Cisneros admitted that he had leadership positions with the Holland Latin Kings in the late 1990s, including a brief stint as an "inca." R. 1303 (Tr. of July 24, 2014 Sentencing at 22:4–8) (Page ID #18743). He also admitted during his plea hearing to having ordered other Holland Latin Kings to firebomb a house in 1996. *See* R. 811 (Tr. of Plea Hearing at 19:1–5) (Page ID #5078). Finally, he did not contest at sentencing the Presentence Report's recitation of his leadership history as a member of the Holland Latin Kings's Crown Council in 1996, casinca of the East Side chapter in 1997, and inca in 1998 for six months until his arrest. *See* R. 1125 (PSR ¶ 679) (Page ID #12709). In light of these various leadership roles, combined with the 1996

incident in which Cisneros admitted to having directed other Holland Latin Kings, it was not plain error to find that Cisneros acted as a manager or supervisor under U.S.S.G. § 3B1.1.

## G. Joseph Martinez

Joseph Martinez pleaded guilty to participating in the Holland Latin Kings racketeering conspiracy, as well as a related conspiracy to distribute over 100 kilograms of marijuana. *See* R. 727 (Plea Agreement at 1) (Page ID #4460).[12] J. Martinez was scored in his Presentence Report with a Base Offense Level of 33, based upon underlying racketeering conduct of an assault with intent to murder. R. 1017 (PSR ¶ 915) (Page ID #10575). J. Martinez received a four-level enhancement based upon a finding that the assault caused life-threatening injuries. *See id.* ¶ 916 (Page ID #10576). J. Martinez further received a one-level multiple-count adjustment, *id.* ¶¶ 921–23 (Page ID #10576), and a three-level leadership enhancement, *id.* ¶ 925 (Page ID #10576). Finally, he was scored a three-level reduction for acceptance of responsibility. *See id.* ¶¶ 929–30 (Page ID #10577). The Presentence Report assessed J. Martinez a Criminal History Category of IV, a Total Offense Level of 38, and a guidelines range (adjusted by applicable statutory maximums) of 324–405 months. *See id.* ¶¶ 950, 995 (Page ID #10582, 10589). At sentencing, J. Martinez's attorney focused on the scoring of the Devon Ruff assault as an attempted murder. *See* R. 1312 (Tr. of Sentencing at 9:6–19) (Page ID #18965). The government called Caesar Garza and James Potts to establish the facts of the incident.

---

[12]Both Joseph Martinez and his brother, Francisco Martinez, are appellants in this case. For clarity, we refer to them respectively as "J. Martinez" and "F. Martinez."

Garza testified that, prior to the stabbing, Devon Ruff stole marijuana from him. *See id.* at 13:6–10 (Page ID #18969). In response, the Holland Latin Kings issued an "SOS" on Ruff— "smash on sight, meaning a beating if we were to see that individual." *Id.* at 13:14–24 (Page ID #18969). Later, Garza and other Holland Latin Kings saw Ruff at a party. *See id.* at 13:11–13 (Page ID #18969). J. Martinez was present, and was the highest ranking Latin King of the group. *See id.* at 14:4–15:1 (Page ID #18970–71). The group of Holland Latin Kings "entered the house to confront Mr. Devon Ruff," *id.* at 14:20–21 (Page ID #18970), and one of them began "hitting" Ruff, who "fell to the floor, and the rest of the [Holland Latin Kings] who were at the party, continued to jump or beat Mr. Ruff while he was on the floor." *Id.* at 15:7–17 (Page ID #18971). This included J. Martinez. *See id.* at 16:2–3 (Page ID #18972). Garza then stabbed Ruff in the chest with a knife. *Id.* at 16:4–14 (Page ID #18972).

Ruff escaped and ran outside. *See id.* at 16:19–17:1 (Page ID #18972–73). The Holland Latin Kings chased him. *See id.* at 17:2–15 (Page ID #18973). While they were running, J. Martinez said "[k]ill that motherfucker," which Garza agreed he took "seriously as an order" coming from his "leader." *Id.* at 17:16–25 (Page ID #18973). The group then continued to beat Ruff. *See id.* at 18:1–25 (Page ID #18974). During this attack, J. Martinez said "[k]ill that motherfucker. We don't let nobody rob us." *Id.* at 19:1–6 (Page ID #18975). Others came to Ruff's aid and police sirens were heard off in the distance, which caused the Holland Latin Kings to "stop attacking a little bit," *id.* at 19:7–12 (Page ID #18975), but J. Martinez said "[d]on't stop. Keep hitting him," and the group complied, *id.* at 19:13–20 (Page ID #18975). James Potts

remembered J. Martinez saying more at this time: "Kill that motherfucker. He'll never rob us again. Kill that bitch-ass motherfucker. Never stop hitting him. Don't stop fucking hitting him." *Id.* at 44:19–21 (Page ID #19000). Potts testified that "during that time a few of us were stopping hitting him because he was already bleeding and basically knocked out and sprawled on the hood of a car. Somebody else had came up, smacked him on the head with a beer bottle, and we were slowing down." *Id.* at 44:21–25 (Page ID #19000). There were "girls getting in the middle and trying to separate the fight" and J. Martinez "said, [f]uck that. Don't stop. If they get in the middle, hit them too. Keep hitting that motherfucker." *Id.* at 44:25–45:3 (Page ID #19000–01). The attack stopped as "people just started to back off in fear of trying to fight the people who were coming to his aid." *Id.* at 20:2–6 (Page ID #18976).

After hearing this testimony, the district court concluded that J. Martinez committed assault with the intent to murder. *See id.* at 58:3–60:21 (Page ID #19014–16). The district court then sentenced J. Martinez to 240 months. *See id.* at 84:13–19 (Page ID #19040). On appeal, J. Martinez argues that the district court erred in finding by a preponderance of the evidence that he intended to murder Devon Ruff and that a jury should have been required to make the finding that he intended to commit murder.

The guidelines calculation for the racketeering conspiracy began with U.S.S.G. § 2E1.1 (2013), which provides that the Base Offense Level is "the greater" of: "(1) 19; or (2) the offense level applicable to the underlying racketeering activity." Section 2A2.1 of the

41

Sentencing Guidelines provides for a Base Offense Level of: "(1) 33, if the object of the offense would have constituted first degree murder; or (2) 27, otherwise." U.S.S.G. § 2A2.1(a) (2013).

Application Note 1 to § 2A2.1 defines "first degree murder" by reference to 18 U.S.C. § 1111(a), which provides:

> Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree.
>
> Any other murder is murder in the second degree.

The § 2A2.1(a)(1) guideline is applicable only upon "a finding of the specific intent to kill," *United States v. Morgan*, 687 F.3d 688, 697 (6th Cir. 2012), and requires "proof of premeditation and deliberation," *United States v. Wilson*, 992 F.2d 156, 158 (8th Cir.), *cert. denied*, 510 U.S. 888 (1993). We "review the district court's factual findings supporting the attempted-murder Guideline under the clear-error standard of review." *Morgan*, 687 F.3d at 696.

J. Martinez argues that the district court made various factual errors and failed properly to rule on disputed issues. First, he mentions the district court's erroneous statement that the drugs that were stolen belonged to J. Martinez, when they actually were stolen from Garza. Second, he describes the district court's statement that the best evidence of someone's intent is what they do: "If they say, Kill him, and they have a knife and they go into the chest cavity like they did this

time . . . that's a pretty clear indication." R. 1312 (Tr. of Sentencing at 59:17–20) (Page ID #19015). J. Martinez views this as demonstrating a mistaken belief that it was he who ordered the stabbing, when the stabbing occurred prior to his orders to kill Ruff. Finally, J. Martinez argues that the group of Holland Latin Kings did not need his direction because an SOS had already been issued and James Potts seemed to indicate that he did not take J. Martinez's directions to kill Ruff "to heart."

Despite some misstatements of the record, the district court's ultimate conclusion was not clearly erroneous. Its error regarding the identity of the person from whom the drugs were initially stolen was not relevant to the overall finding of intent and premeditation because the evidence of these elements came from the preexisting SOS and the group's decision to follow Ruff, attack him, chase him when he escaped, and continue to beat him even as other people tried to break up the fight. The district court's discussion of why it found the requisite premeditation and intent to kill was not always clear: Garza's testimony made clear that he stabbed Ruff before the various statements from J. Martinez directing others to kill Ruff, yet the district court seemed to indicate that intent to kill could be inferred in this case from the fact that the stabbing followed J. Martinez's orders. Even so, the district court's findings as a whole were sufficient because the savage beating that followed J. Martinez's orders itself evinced the necessary intent and premeditation.

The intent requirement under § 1111 can be satisfied either by "kill[ing] another person deliberately and intentionally or . . . act[ing] with callous and wanton disregard for human life."

*United States v. Lawrence*, 735 F.3d 385, 431 (6th Cir. 2013), *cert. denied*, 135 S. Ct. 753 (2014). Even putting aside the stabbing, the savage beating, when combined with evidence of J. Martinez's numerous statements directing others to kill Ruff and warning them not to stop attacking him even as others got in the way and the police closed in, evince at a minimum "callous and wanton disregard for human life." *Id.* Nor is J. Martinez correct to say that he did not have the time to form the requisite premeditation. "An attempted murder is premeditated when it is the result of planning and deliberation," and "'[t]he amount of time needed for premeditation' varies depending on the circumstances, but it must be long enough for the defendant to have formed 'the intent to kill,' and 'be fully conscious of that intent.'" *United States v. Frost*, 521 F. App'x 484, 492 (6th Cir.) (quoting *United States v. Garcia-Meza*, 403 F.3d 364, 371 (6th Cir. 2005)), *cert. denied*, 134 S. Ct. 494 (2013). Here, the cause of the attack—the SOS against Ruff—had been issued long before the incident. The necessary time to form the intent to kill is provided by the fact that the group of Holland Latin Kings saw Ruff, followed him into the house, beat him and Garza stabbed him, and Ruff escaped and they gave chase. After that series of conscious decisions to ambush Ruff and continue to pursue him after a savage beating, J. Martinez instructed his group repeatedly to kill Ruff, even after they began to back down from beating him. It was therefore not clearly erroneous to find that J. Martinez intended to kill Ruff after the requisite premeditation.[13]

---

[13]Nor is there any merit to J. Martinez's suggestion that a jury should have been required to find that the Ruff assault was an assault with the intent to commit murder. We have rejected this argument previously because "both *Apprendi*[ *v. New Jersey*, 530 U.S. 466 (2000)] and

### H. Francisco Martinez

Francisco Martinez pleaded guilty to participating in the Holland Latin Kings racketeering conspiracy, as well as a separate conspiracy to distribute over 100 kilograms of marijuana. *See* R. 1020 (Plea Agreement at 1) (Page ID #10603). His Presentence Report scored him at a Base Offense Level of 26 for the marijuana conspiracy. *See* R. 1265 (PSR ¶ 978) (Page ID #16849). F. Martinez then received a four-level firearm enhancement—two for possession of the firearm and two more for "direct[ing] the use of violence" in connection with the Devon Ruff assault. *Id.* ¶¶ 979–81 (Page ID #16849–50). F. Martinez also received a two-level multiple-count adjustment (one of which was driven by a racketeering act regarding the Devon Ruff assault), *id.* ¶¶ 983–85 (Page ID #16850), and a three-level leadership enhancement, *id.* ¶ 987 (Page ID #16850). Finally, F. Martinez received a two-level reduction for acceptance of responsibility. *See id.* ¶ 991 (Page ID #16850). The Presentence Report assessed F. Martinez a Criminal History Category of III, a Total Offense Level of 33, and a guidelines range of 168–210 months. *See id.* ¶¶ 1012, 1044 (Page ID #16857, 16863).

At sentencing, F. Martinez's attorney focused on the enhancements related to the Devon Ruff assault, arguing that F. Martinez's sole involvement was issuing the SOS order over one year before the assault took place; that it was his brother, Joseph, who gave the "green light" for

---

*Alleyne*[ *v. United States*, 133 S. Ct. 2151 (2013)] took care not to disturb the district court's discretionary fact-finding in other circumstances." *United States v. Smith*, 749 F.3d 465, 487 (6th Cir.), *cert. denied*, 135 S. Ct. 307 (2014). We therefore "ha[ve] concluded that '*Apprendi* does not purport to apply to penalties in excess of any particular range or based on any particular offense level under the Sentencing Guidelines.'" *Id.* (quoting *United States v. Garcia*, 252 F.3d 838, 843 (6th Cir. 2001)).

the assault the day it occurred; and that the SOS order had actually been carried out through a prior attack on Ruff. *See* R. 1328 (Tr. of Aug. 20, 2014 Sentencing at 3:23–9:6) (Page ID #19345–51). The district court overruled the objection, finding that F. Martinez's argument regarding the time delay between the SOS order and the attack was difficult to accept:

> What do I do about a year later? Is that too long? What do I do about six months? Is that too long? It appears that other people relate this ordered beating even though it was a year and a half later back to the inca who ordered it. Other people indicate that too, that this was a result of the inca's order even though it was a year and a half later. Should I just write that off and say, Oh, it was just boys being boys again?

*Id.* at 6:8–15 (Page ID #19348). The district court therefore ruled that treating the assault as relevant to F. Martinez's racketeering conviction was appropriate. *See id.* at 7:15–20 (Page ID #19349). The district court also applied the two-level reduction provided by Amendment 782 to the Sentencing Guidelines. *See id.* at 15:14–24 (Page ID #19357). These rulings created a new guideline range of 121–151 months, and the district court sentenced F. Martinez to 108 months. *See id.* at 22:17–18 (Page ID #19364).

On appeal, F. Martinez contests the scoring related to the Devon Ruff assault, arguing that the Ruff assault was not relevant conduct under U.S.S.G. § 1B1.3; that the SOS order he issued was too remote in time to trigger responsibility for the subsequent assault; and that because it was J. Martinez who ordered the assault that day, F. Martinez cannot be held responsible for the aggravated nature of the attack.

The Ruff assault was discussed in connection with J. Martinez's appeal, *supra* Part II.G, but F. Martinez's case is in a slightly different posture because no witnesses testified in

connection with his sentencing. The facts in F. Martinez's Presentence Report showed that Caesar Garza obtained a pound of marijuana from Mario Herrera, planning to sell it to Devon Ruff. *See* R. 1265 (PSR ¶ 475) (Page ID #16765–66). When Garza met with Ruff, Ruff robbed him of the marijuana. *See id.* ¶ 476 (Page ID #16766). Herrera then reported the incident to F. Martinez—then leader of the West Side chapter of the Holland Latin Kings. *See id.* ¶ 477 (Page ID #16766). F. Martinez "immediately issued an 'SOS.'" *Id.* "Approximately a year and a half later," Garza "was at a house party . . . along with Joseph Martinez, Roberto Reese, James Potts, and Vernardo Quesada," when he saw Ruff enter the party. *Id.* Garza told J. Martinez, who "reportedly gave him the 'green light' to assault Davon Ruff." *Id.* Later, a number of defendants "all stated this assault was an SOS carried out in response to Davon Ruff stealing marijuana that belonged to the [Holland Latin Kings] enterprise." *Id.* (PSR Addendum at 1) (Page ID #16866). Although Ruff testified before the grand jury to having been previously attacked by Holland Latin Kings—after the SOS was issued but before the attack in question here—the probation officer concluded that this prior attack related to a separate gang rivalry. *See id.* at 1–2 (Page ID #16866–67).

The district court did not clearly err in finding the Ruff attack to be relevant conduct to F. Martinez's racketeering conviction. Relevant conduct is defined by U.S.S.G. § 1B1.3(a) (2013), which states that "the base offense level where the guideline specifies more than one base offense level . . . shall be determined on the basis of . . . all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." For

conspiracies, relevant conduct extends to "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." *Id.* § 1B1.3(a)(1)(B) (2013). Relevant conduct need be found by only a preponderance of the evidence. *See Corrado*, 227 F.3d at 542.

Although F. Martinez argues that the district court's decision improperly found the Ruff assault to be relevant conduct under a common-scheme theory, such a theory is more applicable where the conduct is a series of similar transactions. *See, e.g.*, *United States v. Woods*, 367 F. App'x 607, 611–12 (6th Cir. 2010) (fraudulent credit-card and identity-theft transactions stitched together as relevant to a common scheme). The district court did not imply that the Ruff attack was part of a series of similar gang actions; rather, it noted evidence that F. Martinez ordered an SOS on Ruff in connection with the racketeering conspiracy and that the attack was caused by that SOS. *See* R. 1328 (Tr. of Aug. 20, 2014 Sentencing at 6:8–15) (Page ID #19348). The attack was thus considered relevant conduct because it was an "act[] . . . commanded . . . by the defendant." U.S.S.G. § 1B1.3(a)(1)(A) (2013). The mere fact that the SOS order was issued approximately two years before the attack took place is not sufficient to break the connection between it and the attack because there was evidence from multiple sources that the individuals who carried out the attack did so in reliance on the SOS. *Cf. United States v. Roederer*, 11 F.3d 973, 979–80 (10th Cir. 1993) (holding defendant responsible for relevant conduct that included drug distribution in a 1980–87 conspiracy when the charge was a 1992 distribution, due to the similarities between the courses of conduct).

The attack is also relevant conduct by virtue of the conspiracy provisions of U.S.S.G. § 1B1.3(a)(1)(B) (2013) because it was reasonably foreseeable to F. Martinez that his SOS—issued in response to the theft of drugs from the Holland Latin Kings—would lead to an attack very similar to the one that occurred. For this reason, F. Martinez's second argument—that the extent of the injuries cannot be attributed to him—also fails. He admits that an SOS can mean "stab on sight." F. Martinez Appellant Br. at 12. It was therefore foreseeable that an attack on Ruff could be as severe as the assault was. *See United States v. Garcia*, 754 F.3d 460, 484–85 (7th Cir. 2014) (violent acts in response to incursion on a Latin Kings gang's territory were reasonably foreseeable to its leader, where evidence suggested the violent nature of the Latin Kings's defense of their turf and the leader's involvement therein), *cert. denied*, 135 S. Ct. 991 (2015); *United States v. Patton*, 14 F. App'x 450, 454–55 (6th Cir. 2001) (abduction that occurred during a bank robbery was reasonably foreseeable to one of the robbers "given the inherently violent nature of an armed robbery offense"), *cert. denied*, 534 U.S. 1100 (2002).[14] The district court therefore did not clearly err in considering the Ruff attack to be relevant conduct in F. Martinez's sentencing, and in holding him responsible for the aggravated nature of the attack.

---

[14]Finally, F. Martinez's argument that Joseph Hernandez's involvement in giving the "green light" immediately before the attack absolves him of responsibility is not sufficient to show that the district court clearly erred. There can be multiple causes to an event, so the fact that many co-defendants pointed to F. Martinez's SOS as the cause of the attack is sufficient to support the district court's conclusion.

Nos. 14-1360, 14-1600, 14-1717, 14-1804, 14-1839, 14-1986, 14-2094, 14-2129, 14-2249
*United States v. Penaloza et al.*

## I. Julio Hernandez

Julio Hernandez pleaded guilty to participating in the Holland Latin Kings racketeering conspiracy, as well as conspiring to possess with the intent to distribute 100 kilograms or more of marijuana. *See* R. 1070 (Plea Agreement at 1) (Page ID #11493). Hernandez's Presentence Report scored him a Base Offense Level of 33, due to the racketeering conduct of an assault with intent to murder. R. 1304 (PSR ¶ 982) (Page ID #18922). Hernandez received a one-level multiple-count adjustment, *id.* ¶¶ 996–98 (Page ID #18923–24), and a two-level reduction for acceptance of responsibility, *id.* ¶ 1004 (Page ID #18924). The Presentence Report assessed Hernandez a Criminal History Category of III, a Total Offense Level of 32, and a guidelines range of 151–188 months. *See id.* ¶¶ 1018, 1053 (Page ID #18928, 18933).

At sentencing, Hernandez objected to the scoring of the Sean Gray attack as an assault with the intent to commit murder. *See* R. 1355 (Tr. of Sept. 22, 2014 Sentencing at 11:1–14:6) (Page ID #19869–72). The district court overruled this objection. *See id.* at 17:19–18:22 (Page ID #19875–76). Hernandez also argued for a downward variance, asserting that his role in the offense and criminal-history category were both overstated by the guidelines range and that he had sought to turn his life around. *See id.* at 32:11–35:21 (Page ID #19890–93). The district court concluded that a two-level variance was appropriate and sentenced Hernandez to 120 months of incarceration. *See id.* at 36:20–38:19 (Page ID # 19894–96).

On appeal, Hernandez raises three issues. First, he contends that the district court erred in scoring the assault on Sean Gray as an assault with the intent to commit murder. Second, he

50

argues that his sentence was substantively unreasonable because his role in the overall conspiracy was limited. Third, he challenges the district court's imposition of a supervised-release restriction that will prevent him from consuming alcohol.[15]

### 1. Assault on Sean Gray

Hernandez argues that the district court failed to make appropriate factual findings supporting the application of a U.S.S.G. § 2A2.1(a)(1) enhancement, and that the record cannot support such findings. The government contends that the panel's review of the issue should be for plain error because although Hernandez objected to the scoring of the Sean Gray assault under § 2A2.1(a)(1), he did not object at the close of sentencing to the allegedly inadequate factual findings made by the district court. The government is correct that after the district court asked the "*Bostic* question," Hernandez did not assert a specific objection to the allegedly inadequate factual findings. R. 1355 (Tr. of Sept 22, 2014 Sentencing at 40:22–41:1) (Page ID #19898–99). Although a defendant need not mention issues that were "previously . . . raised" in response to the *Bostic* question, *United States v. Bostic*, 371 F.3d 865, 872 (6th Cir. 2004), an objection must be made to "the adequacy of the court's explanation for the sentence," which "bec[o]me[s] apparent as soon as the court finishe[s] announcing its proposed sentence."

---

[15]Hernandez also raised a fourth issue, asking that if we agree with him regarding the Sean Gray assault—which would mean that his drug-conspiracy conviction would drive his sentencing on remand—the district court be directed to apply the two-level reduction in drug sentences provided by Amendment 782 to the Sentencing Guidelines. Because we affirm the district court regarding the Sean Gray assault, we do not address this issue.

*Vonner*, 516 F.3d at 386. Accordingly, our review of the adequacy of the district court's articulated findings is for plain error.

On July 30, 2006, Hernandez and his then-girlfriend Vanessa Ruiz went to a gas station, where they encountered Sean Gray—a former Holland Latin King whose departure from the gang was controversial. *See* R. 1304 (PSR ¶ 187) (Page ID #18797). Gray and Hernandez got into a "verbal altercation." *Id.* Ruiz and Hernandez left in the car to drive to a friend's house, but that friend was not home, so they continued driving, ultimately encountering Gray. *See id.* ¶ 187 (Page ID #18797). As they drove by, Hernandez fired a handgun at Gray—who was about eight feet away—and stated "I shot that mother fucker." *Id.* ¶¶ 187, 191 (Page ID #18797–98). Ruiz drove to Hernandez's home and asked him to get out of the car, but Hernandez "took the gun and placed it up against her ribs and told her to go." *Id.* ¶ 191 (Page ID #18798). Hernandez kept the gun to her ribs, told her to drive to Sean Gray's house and to slow down as they got close to it. *See id.* ¶¶ 191–92 (Page ID #18798). Hernandez then fired a shot at the house. *See id.* ¶ 192 (Page ID #18798). Although it turned out that Gray was not home at the time, his mother was home, along with three children, and the bullet went through the living room and hit the refrigerator. *See id.* ¶ 186 (Page ID #18797).

Section 2A2.1 of the Sentencing Guidelines provides for a Base Offense Level of: "(1) 33, if the object of the offense would have constituted first degree murder; or (2) 27, otherwise." U.S.S.G. § 2A2.1(a) (2013). As discussed, *supra*, the Application Notes to § 2A2.1 define "first degree murder" by reference to 18 U.S.C. § 1111. The § 2A2.1(a)(1) guideline is

applicable only upon "a finding of the specific intent to kill," *Morgan*, 687 F.3d at 697, and generally requires "proof of premeditation and deliberation," *Wilson*, 992 F.2d at 158.

The district court did not err in finding that the facts warranted application of § 2A2.1(a)(1). Whether Gray or Hernandez started the altercation at the gas station, Hernandez nonetheless had time to form the requisite intent before shooting at Gray. Upon encountering Gray on the street, Hernandez made the deliberate decision to shoot at him with a handgun, and then to force Ruiz at gunpoint to drive him to Gray's house to shoot at the house as well. Although Hernandez may not have been actively looking for Gray before the first shooting, that is not dispositive: "An attempted murder is premeditated when it is the result of planning and deliberation," and "'[t]he amount of time needed for premeditation' varies depending on the circumstances, but it must be long enough for the defendant to have formed 'the intent to kill,' and 'be fully conscious of that intent.'" *Frost*, 521 F. App'x at 492 (quoting *Garcia-Meza*, 403 F.3d at 371). Given that there was no evidence of any sudden provocation immediately before the first shooting and that Hernandez undisputedly sought out Gray for the second shooting, it was not clear error to conclude that the time between encountering Gray and Hernandez's decisions to shoot, while not extensive, was sufficient for Hernandez to form the intent to kill.

Hernandez's related argument that the district court's findings in support of the guideline application were insufficient is reviewed only for plain error. Although the district court could have been more fulsome, the colloquy that preceded the district court's ruling was sufficient

under plain-error review. The district court questioned extensively about the precise timing between the fight at the gas station and the two shooting incidents, establishing that there was a gap of more than a few minutes. *See* R. 1355 (Tr. of Sept. 22, 2014 Sentencing at 12:20–13:19) (Page ID #19870–71). The district court then made a point regarding Hernandez's intent in shooting at Gray's home: "Why do we shoot at a house that we've had a fight with the individual a couple hours before for? Why do we do that? . . . . Target practice or do we do it in case we intimidate them or perhaps shoot them? *Id.* at 13:25–14:5 (Page ID #19871–72). The district court later reiterated: "Well, what would be the sense of shooting at the house if you didn't believe he was there? It wouldn't make any difference." *Id.* at 17:19–21 (Page ID #19875). The district court then ruled, beginning with a response to the argument that Hernandez shot the house to scare Gray because Hernandez was physically intimidated by Gray:

> That doesn't help your argument. That doesn't help your argument at all. If he had fear of him, that's even more reason why he'd want to shoot.
>
> I think there's enough here. It's an attempt to commit murder, and all the shooting that took place at those various times . . . that particular night while Mr. Hernandez was in possession of this handgun together with the shot at the house and the confrontations that occurred previous to that give this Court reason to believe that there is certainly a preponderance of evidence to support that assault with intent to commit murder. I think it's scored correctly. Minds might differ, but that's not what it's over. I think it's clear enough to score it correctly at that.

*Id.* at 18:12–22 (Page ID #19876). Although the district court did not recite the elements of attempted murder or state precisely the factual basis for finding that Hernandez formed the intent to kill, the findings and colloquy were sufficient under plain-error review and the district court

did not "merely parrot[] the PSR." *United States v. Harris*, 552 F. App'x 432, 441 (6th Cir. 2014).

### 2. Substantive Reasonableness

Although his 120-month sentence resulted from a two-level variance downward from the applicable guidelines range, Hernandez nonetheless contends that his sentence is substantively unreasonable. He "bear[s] a heavy burden" of convincing the panel that his below-guidelines sentence is unreasonable. *Greco*, 734 F.3d at 450. Indeed, even a within-guidelines sentence "is afforded 'a rebuttable presumption of reasonableness,'" *Berry*, 565 F.3d at 341 (quoting *Williams*, 436 F.3d at 708), given "the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, both the sentencing judge and the Sentencing Commission will have reached the same conclusion as to the proper sentence in the particular case," *id.* (quoting *Wilms*, 495 F.3d at 281).

Hernandez points to what he terms his minimal role in the Holland Latin Kings in support of his argument that a greater variance was required. Although he insinuates that the district court failed to grapple with these facts, Hernandez's limited role was the reason for the two-level downward variance that the district court granted. *See* R. 1355 (Tr. of Sept. 22, 2014 Sentencing at 36:20–38:15) (Page ID #19894–96). Hernandez cites no authority that supports his claim that this smaller role *mandates* that he receive a greater downward variance. Given the district court's finding that Hernandez committed an assault with the intent to murder in connection with

the underlying conspiracy, we disagree with the contention that Hernandez's role was so obviously minor that a more significant variance was required.

### 3. Conditions of Supervised Release

Hernandez's final argument is that the district court wrongly imposed as a condition of his supervised release the requirement that he abstain from drinking alcohol. At sentencing, the district court expressed concern about substance abuse, directing that "[Hernandez] at least for the first part of that supervised release have urine drops to ensure that you are going to be free of any drugs." R. 1355 (Tr. of Sept. 22, 2014 Sentencing at 39:13–15) (Page ID #19897). The district court continued: "I don't want any alcoholic beverages used. That's a gateway, and I don't want you to even be tempted on the gateway to something else. You are not to frequent any place whose primary purpose is the serving of alcohol such as a bar or a tavern." *Id.* at 39:15–19 (Page ID #19897). Hernandez admits that this issue is subject to plain-error review because he did not object to the condition at sentencing. *See* Hernandez Appellant Br. at 24. He therefore must demonstrate "(1) error (2) that 'was obvious or clear,' (3) that 'affected defendant's substantial rights' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'" *Vonner*, 516 F.3d at 386 (quoting *Gardiner*, 463 F.3d at 459).

"District courts are permitted to impose any special conditions of supervised release they deem reasonably related to the enumerated sentencing factors." *United States v. Stepp*, 680 F.3d 651, 671 (6th Cir. 2012). "As with other sentencing conditions, we conduct inquiries into both procedural and substantive reasonableness when reviewing special conditions." *Id.* On the

procedural side, "'[t]he district court, at the time of sentencing, must state in open court the reasons for its imposition of the particular sentence, including its rationale for mandating special conditions of supervised release.'" *United States v. Carter*, 463 F.3d 526, 528–29 (6th Cir. 2006) (quoting *United States v. Kingsley*, 241 F.3d 828, 836 (6th Cir. 2001)) (alterations omitted). The substantive inquiry asks whether the condition "'is reasonably related to the dual goals of probation, the rehabilitation of the defendant and the protection of the public.'" *Id.* at 529 (quoting *United States v. Bortels*, 962 F.2d 558, 560 (6th Cir. 1992)).

Hernandez argues that the alcohol condition failed both tests—the district court gave only minimal explanation that alcohol was a "gateway," there was no reason to think that alcohol played a role in the offense, and Hernandez indicated that he stopped drinking alcohol six years before his sentencing. Although the Presentence Report indicated that Hernandez largely ceased drinking six years prior, he reported that "he has a beer on special occasions now," and also reported that "he was smoking [marijuana] daily at the time of his arrest, using a gram every couple of days." R. 1304 (PSR ¶¶ 1040–41) (Page ID #18932). Hernandez cited *United States v. Salaam*, No. 13-6355 (6th Cir. July 14, 2014), as support for his argument, but that unpublished order addressed a life-long alcohol ban where "[n]othing in the record suggest[ed] that [the defendant] has any problem with alcohol," *id.* at 5.

Although not cited by either party, we have held in a published decision that "the pertinent statute on discretionary conditions does not permit a total ban on alcohol, but allows a court to order the defendant to 'refrain from *excessive use* of alcohol.'" *United States v. Inman*,

666 F.3d 1001, 1005 (6th Cir. 2012) (per curiam) (quoting 18 U.S.C. § 3563(b)(7)). Accordingly, in a case where a district court imposed a lifetime term of supervised release and accompanied it with a condition that the defendant not consume alcohol, we required that "the district court . . . explain why these conditions of supervised release are warranted," where "[n]othing in the record suggests that [the defendant] has any problem with alcohol or drug dependence; yet, he is now barred from consuming alcohol for life." *Id.* But we have allowed complete bans on the consumption of alcohol in certain circumstances. In *United States v. Collins*, 799 F.3d 554 (6th Cir.), *cert. denied*, 136 S. Ct. 601 (2015), we reiterated the general rule that "[a] district court's failure to explain its reasons for imposing a special condition will be deemed harmless error . . . if such reasons are clear from the record," *id.* at 599 (quoting *United States v. Carter*, 463 F.3d 526, 529 n.2 (6th Cir. 2006)). Thus, where the defendant had a "history of drug abuse and was convicted of a drug-related offense," the reasons for a complete ban on alcohol consumption during a period of supervision were "obvious." *Id.* at 598–99; *see also United States v. Robinson*, 813 F.3d 251, 260 (6th Cir. 2016) (affirming alcohol ban where the defendant "had a length history of substance abuse, and a conviction for driving under the influence of alcohol"). Here, the district court's concern that alcohol might lead to Hernandez using narcotics is understandable, given Hernandez's use of marijuana daily at the time of his arrest, and the fact that he was convicted of a drug-related offense. It was not plain error for the district court to impose a ban on Hernandez consuming alcohol during his period of supervised release.

### III.  CONCLUSION

For the foregoing reasons, we **REMAND** Matthew Penaloza's case for consideration of his argument that the Supreme Court's recent decision in *Johnson v. United States*, 135 S. Ct. 2551 (2015), affects his sentence.  We **AFFIRM** Penaloza's sentence in all other respects, and also **AFFIRM** the sentences of all other defendants.