NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0362n.06

No. 11-6461

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Apr 11, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF TENNESSEE |
| DONNELL FROST, Sr., | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: BATCHELDER, Chief Circuit Judge; DAUGHTREY and ROGERS, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Defendant Donnell Frost, Sr., challenges his conviction and 120-month sentence for being a felon in possession of a firearm. He argues that the district court erred when it: (1) denied his motion to suppress evidence obtained from a warrantless search of his house; (2) improperly calculated his criminal history category; (3) cross-referenced his sentence to attempted murder; and (4) failed to give him credit for acceptance of responsibility. We find no error in the district court's denial of the defendant's motion to suppress or in the court's imposition of sentence. We therefore affirm the judgment.

**FACTUAL AND PROCEDURAL BACKGROUND**

The events in this case arose from a neighborhood disturbance call to the Memphis Police Department that brought officers to a location close to defendant Frost's home.

There they encountered Frost's son, Donnell Frost, Jr. (known as "DJ"), who at the time was 16 years old. DJ told the officers that he and his father had gotten into a physical altercation when DJ left the house carrying his mother's cell phone. He said that his father followed him out of the house and demanded that DJ return the phone. When DJ refused to do so, father and son began to punch one another, and Frost slammed DJ into the ground. DJ eventually managed to get away. As he walked down the street, he heard his father enter and exit the house. When DJ looked back, he said, his father was moving quickly towards him with a gun in his hand, which he then shot once. DJ later testified that his father shot directly at him and that he could see the "fire from the muzzle." However, Frost testified that he shot in the air only, intending to "wake [DJ] up" and to teach him respect, "to scare him to just doing the right thing." He denied that he intended actually to harm his son.

After the gunshot, DJ used his mother's cell phone to call the police for help. Three officers responded to DJ's call and, having ensured DJ's safety, they went to Frost's home and knocked on the door, with guns drawn. When Frost answered the door, the police immediately arrested him, handcuffed him, and placed him in the back of a squad car. The officers then sought permission to search Frost's residence for the gun used in the shooting. They first asked DJ's mother, Linda Anderson, if they could search the house, but she refused to give permission, saying that the house belonged to Frost, not to her. She suggested that the officers "go outside and ask Frost" for permission instead. The officers returned to the patrol car where the defendant was detained and asked him for

consent. Frost refused to sign a consent form, but he told the officers that they could "search all that [they] want because he didn't have any firearms and he had fired no shots at anybody." Asked later by defense counsel whether Frost said, "Go in and search my house, but I'm not going to sign the form," Officer Guy Hendree responded, "Sir, that's what he said." The police interpreted Frost's statements as an oral consent to search and went back into the house. There they discovered a .38 caliber Derringer pistol, loaded with one live round and one spent round; it was stuffed between the box spring and mattress of a bed in a bedroom of the house.

On the basis of this evidence, Frost was indicted on one count of being a convicted felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). He filed a motion to suppress the pistol on the ground that the search was not consensual but, following a hearing and several rounds of briefing, the magistrate judge assigned to the case filed a report with the district judge recommending that Frost's motion to suppress be denied. *United States v. Frost*, No. Cr. 10-20219-JPM-CGC, 2011 WL 1466438 (W.D. Tenn. March 14, 2011). After *de novo* review of the magistrate judge's legal conclusions, the district court adopted the report in its entirety and denied Frost's motion to suppress. *United States v. Frost*, No. 2:10-CR-20219-JPM, 2011 WL 1466430 (W.D. Tenn. Apr. 18, 2011). Frost later pleaded guilty to the charge against him, pursuant to an agreement with the government that allowed him to appeal the district court's denial of his motion to suppress.

Prior to Frost's sentencing hearing, a presentence report computed his base offense level at 33 – the base offense level for attempted first-degree murder. The report also recommended a two-level upward adjustment for obstruction of justice and placed Frost in Criminal History Category V, resulting in a Guidelines range of 262–327 months, but with a statutory upper limit of 120 months. The district court ultimately sentenced Frost to the statutory maximum term of 120 months' imprisonment, to be followed by two years of supervised release. This appeal followed.

## DISCUSSION

### A. Denial of the Motion to Suppress

Frost argues that the district court erred when it denied his motion to suppress the evidence gathered in the warrantless search of his home. He claims that he did not give the free and voluntary consent required to exempt searches from the Fourth Amendment's warrant requirement. *See United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011) ("While the Fourth Amendment protects citizens against unreasonable searches and seizures, a search . . . is not unreasonable if that person gives free and voluntary consent."). In cases involving allegedly consensual searches, "[t]he government bears the burden of demonstrating by a preponderance of the evidence, . . . that the consent was voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009). Frost argues that his consent was not *voluntary* because he gave it under conditions of duress – namely,

while handcuffed and sitting in the back of a patrol car, after having been arrested by three police officers who came to the front door of his home with guns drawn. Frost also argues that his consent was not *unequivocal* because he told police that they could "search all they want" only after refusing to sign a written statement of consent.

In denying Frost's motion to suppress, the district court rejected both arguments. The court first determined that the conditions under which Frost gave his consent were not so coercive as to call into question its voluntariness, noting that although Frost was detained at the time he gave his consent, he had not been detained for long. The court also observed that the officers had drawn their guns when they arrested Frost but had put them away before approaching Frost to ask for his consent. The district judge therefore concluded that there was no "evidence that any officer threatened or coerced [the] Defendant" into giving his consent and that the government had met its burden of proving voluntariness. *Frost*, 2011 WL 1466430, at *4. The judge also rejected Frost's claim that his consent was at best equivocal, finding that Frost's statement to the police that they "could search his house all [they] want[ed]" indicated unqualified and unequivocal consent that was not undermined by his refusal to sign a written consent form. *Id*.

We review a district court's findings of fact regarding motions to suppress for clear error and its legal conclusions *de novo*. *United States v. Hudson*, 405 F.3d 425, 431 (6th Cir. 2005). "Whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998)

(*en banc*). Hence, a "district court's finding of voluntary consent will be reversed only if clearly erroneous." *Id*. at 822 (citing *United States v. Calhoun*, 49 F.3d 231, 234 (6th Cir. 1995)). "A finding of fact is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Harlamert v. World Finer Foods, Inc.*, 489 F.3d 767, 771 (6th Cir. 2007) (internal quotation marks omitted).

Given this standard, we cannot say that the district court's determination of voluntariness was clearly erroneous. In reaching its conclusion that Frost's consent was untainted by duress or coercion, the court took into account many of the factors that we have articulated as relevant to the determination of the voluntariness of consent. *See, e.g.*, *Beauchamp*, 659 F.3d at 572 (noting that "[s]everal factors should be examined in the consent calculus": first, "the characteristics of the accused, including the age, intelligence, and education of the individual; whether the individual understands the right to refuse to consent; and whether the individual understands his or her constitutional rights"; and second, "the details of the detention, including the length and nature of detention; the use of coercive or punishing conduct by the police; and indications of 'more subtle forms of coercion that might flaw [an individual's] judgment'" (quoting *United States v. Watson*, 423 U.S. 411, 424 (1976))). The district court considered Frost's individual characteristics, noting that his "age and intelligence 'indicate[d] the ability to freely consent.'" 2011 WL 1466430, at *4 (quoting *United States v. Worley*, 193 F.3d 380, 386 (6th Cir. 1999)). It also

considered the details of Frost's detention, such as its length and the conduct of the police who enforced it. *Id*.

The only potential error the court might have made when determining whether the consent was voluntary was in failing to consider the police officers' failure to inform Frost of his right to refuse consent. Although we have recognized that police officers are not constitutionally obligated to inform suspects of their right to refuse consent, we have also indicated that failure to do so should be considered when analyzing the voluntariness of a defendant's consent. *Beauchamp*, 659 F.3d at 572. Even if this was an error on the district court's part, however, we deem it to have been harmless. *See United States v. Garcia*, 496 F.3d 495, 506 (6th Cir. 2007) (applying harmless-error review to errors made in suppression decisions). The fact that Frost refused to provide written consent to search suggests that he knew that he had the right to refuse consent even without the officers' saying so and, moreover, was unafraid to exercise this right. It also supports the court's conclusion that Frost was not so cowed by the officers' presence and their seizure of him that he felt incapable of saying no to whatever they requested of him. Frost's challenge to the district court's voluntariness analysis is therefore not persuasive.

The district court also found that Frost's consent was unequivocal. That call is superficially a closer one, but only because the oral consent was accompanied by the defendant's refusal to provide written consent. However, after focusing on Frost's statement, we agree with the court's conclusion that Frost's consent was unequivocal

based on its content.[1]   Certainly, Frost's oral consent can be distinguished from the statement in *Worley*, despite Frost's argument to the contrary.  In that case, when asked by police officers for consent to search his bag, Worley answered, "You've got the badge, I guess you can."  The district court concluded that Worley's statement was not an unequivocal act of consent but instead "a response conveying an expression of futility in resistance to authority or acquiescing in the officers' request," and we upheld its ruling. *Worley*, 193 F.3d at 386.  In this case, by contrast, Frost's statement can hardly be interpreted as an assertion of futility, given its content as well as Frost's intransigence in refusing to sign the consent form.  Other than conveying unequivocal consent, the statement can be read only as an attempt to mislead the officers about what a search would yield.

## B.  The Criminal History Calculation

Frost's challenge to the calculation of his criminal history involves a Tennessee state court's sentence imposed in May 1989.  At that time, Frost was sentenced to five years' imprisonment on each of four counts of aggravated assault, to run concurrently.  He was also sentenced to five years' imprisonment on one count of unlawful sale of cocaine, and

---

[1]As we indicated in *Worley*, after analyzing the totality of the circumstances and determining that the defendant's consent was not coerced, we may determine the equivocalness of the consent on the basis of its content alone. *Worley*, 193 F.3d at 386 (noting that even where "there [is] no evidence of overt duress or coercion . . . we do not end our inquiry . . . [but] also examine the *content* of [defendant's] statement to ensure that it 'unequivocally, specifically, and intelligently' indicates that the defendant consented" (emphasis added) (quoting *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992))).  Nevertheless, the *Worley* court did consider  various additional circumstances in determining that the defendant's statement was equivocal, as did the district court in this case in coming to the opposite conclusion.

the latter sentence was ordered to run consecutively to the previous four.  Frost argues that the district court violated USSG § 4A1.2(e) by including the four aggravated-assault sentences in its calculation of his criminal history.  That provision prohibits courts from including in their calculation of a defendant's criminal history category sentences that were imposed more than 15 years before the sentencing offense and that did not result in the defendant's incarceration during some part of the 15-year period.  Frost claims that, under § 4A1.2(e), the aggravated sentences should not be counted because he completed them in 1992, more than 15 years before he committed the instant offense on January 10, 2010.  Although he does not contest the fact that he was incarcerated in a Tennessee state prison from June 7, 1994, until March 27, 1996, he claims that his incarceration was purely a result of the drug-trafficking sentence and not the sentences for aggravated-assault.

To support his claim that he finished serving the aggravated-assault sentences in 1992, even as he remained in prison on the drug-trafficking conviction, Frost relies upon a summary report that he received from the Tennessee Department of Corrections (TDOC) on October 24, 2011.  The report indicates that Frost's aggravated-assault sentences "expired" on October 14, 1992, and that the drug-trafficking sentence "expired" on March 20, 1996.  Frost invokes this summary report as proof that, although he remained incarcerated in state prison until 1996, he was not incarcerated after 1992 as a result of the aggravated-assault convictions.

However, testimony provided at the sentencing hearing by the probation officer who prepared Frost's presentence report casts doubt on whether the TDOC summary actually

means what Frost says it means. In response to the same argument that Frost raises here, the district judge ordered the probation officer to explain what notations in the summary meant. The officer testified that, although the report is technically correct, the expiration date provided in it reflects the date on which Frost's sentences would have been completed "absent other conduct." In Frost's case, however, there was considerable "other conduct." After being paroled on December 20, 1990, Frost was arrested for violating his parole on August 2, 1991, re-paroled on July 9, 1992, and once again arrested for violating his parole on May 11, 1994. His parole was revoked on June 7, 1994, and he was finally discharged from prison on March 27, 1996. As a result, the date on which Frost actually completed his sentence was considerably delayed. TDOC sent an email to the probation officer informing her that Frost actually completed the concurrent aggravated-assault sentences, as well as the additional consecutive sentence, only as of the date of his release from prison, March 27, 1996. Based on the email and the testimony of the probation officer, the district court concluded that the TDOC summary was not a reliable document and that, because Frost was incarcerated on all five sentences until March 27, 1996, the aggravated-assault convictions could be included in his criminal history.

On appeal, we review the district court's application of the Sentencing Guidelines *de novo* and the district court's findings of fact for clear error. *United States v. Hunt*, 487 F.3d 347, 350 (6th Cir. 2007). Under this standard, Frost's challenge to the district court's calculation must fail. In reaching the factual conclusion that Frost remained incarcerated on the aggravated-assault charges until 1996, the court committed no clear error. Indeed,

Frost points to no evidence demonstrating that the district court committed *any* error, clear or otherwise, in concluding that the summary report on which he relied was less reliable than the information that the probation officer received directly from TDOC. We thus decline to overturn the district court's calculation of Frost's criminal history category.

## C. The Cross-Reference to Relevant Conduct

The sentencing guidelines applicable to defendants convicted of unlawful possession of a firearm are found in USSG § 2K2.1. Subsection (c)(1) of that guideline provides that in cases in which "the defendant used or possessed any firearm or ammunition in connection with the commission or attempted commission of another offense . . . [courts should] apply . . . § 2X1.1 in respect to that other offense, if the resulting offense level is greater than that determined above." USSG § 2K2.1(c)(1). Section 2X1.1 in turn directs the district court to use "[t]he base offense level from the guideline for the substantive offense [committed or attempted in connection to the use or possession of the firearm], plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." USSG § 2X1.1(a). District courts may cross-reference under § 2K2.1 only where a preponderance of the evidence supports the conclusion that the defendant committed or attempted to commit the offense that provides the cross-reference. *United States v. Gates*, 461 F.3d 703, 708 (6th Cir. 2006) (holding that the preponderance of the evidence standard applies post-*Booker*).

At sentencing in this case, the district court determined that a preponderance of the evidence supported the conclusion that by shooting at his son, Frost attempted to commit first-degree murder, as defined in 18 U.S.C. § 1111(a). Accordingly, the court set Frost's base offense level at 33. *See* USSG § 2A2.1(a) (establishing a base offense level of 33, for attempted murder "if the object of the offense would have constituted first degree murder" and a level of 27 otherwise).

Frost challenges this determination on sufficiency-of-the-evidence grounds. He argues that the government failed to establish all of the elements necessary to prove attempted first-degree murder under federal law. Specifically, he contends that the government did not prove that he acted with premeditation and deliberate intent to kill. Both are required elements of attempted first-degree murder. *United States v. Wesley*, 417 F.3d 612, 618 (6th Cir. 2005) ("To convict a defendant of attempt, the government must prove (1) the defendant's intent to commit the criminal activity; and (2) that the defendant committed an overt act that constitutes a 'substantial step' toward commission of the crime."); 18 U.S.C. § 1111(a) (defining first degree murder as the "willful, deliberate, malicious, and premeditated [unlawful] killing" of a human being). Because Frost challenges the district court's factual conclusions as to premeditation and specific intent, we review those findings for clear error. *United States v. Brika*, 487 F.3d 450, 454 (6th Cir. 2007).

To support his claim that the government failed to establish specific intent, Frost focuses on several items of evidence. First, he points to the fact that he fired only one shot

at DJ and did not shoot again, even though he still had one bullet in the chamber. He also asserts that he fired the gun when DJ was a significant distance away and "running away from him at an angle." Finally, he points to DJ's testimony at the sentencing hearing that, shortly before the shooting, he told his father that he would come back with his brother to "get" him. Frost argues that the "near [physical] impossibility" that he could manage to hit DJ, the fact that he shot the gun only once, and DJ's threat to do him harm all support the conclusion that he shot at his son to scare him and not because he had the specific intent to kill.

To support his claim that the government failed to establish premeditation, Frost points to the fact that the shooting occurred in the midst of a heated encounter between himself and DJ. Because the evidence demonstrates that he fired the gun "in the heat of the moment," Frost argues, it fails to establish the premeditation necessary to sustain a first-degree murder cross-reference.

We conclude that neither argument has merit. With respect to the question of specific intent, the gloss that Frost puts on the evidence is marginally plausible. However, that interpretation does not make the district judge's alternative interpretation clearly erroneous. As the Supreme Court has noted, "[W]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer*, 470 U.S. 564, 574 (1985). Here, there was nothing impermissible about the district court's conclusion that Frost shot with the intent to kill. The circumstances of the shooting do not make it implausible to conclude that Frost fired the

gun intending to hit DJ. Frost claimed that he shot at DJ from 40 feet away but, in his testimony, DJ suggested the distance was much less than that. Moreover, other courts have found specific intent in similar circumstances. *See, e.g.*, *United States v. Drew*, 200 F.3d 871, 875 (D.C. Cir. 2000) (affirming an attempted first-degree murder cross-reference for a defendant who pointed a gun at his wife and pulled the trigger once, but gun did not discharge).

Frost's challenge to the district court's finding of premeditation is also not persuasive. Although the evidence does establish, as Frost asserts, that the encounter between Frost and his son was unanticipated and quite heated, it does not render the district court's conclusion that Frost acted with premeditation clearly erroneous. An attempted murder is premeditated when it is the result of planning and deliberation. *See United States v. Garcia-Meza*, 403 F.3d 364, 371 (6th Cir. 2005) (approving jury instructions stating this proposition as the test for premeditation). "The amount of time needed for premeditation" varies depending on the circumstances, but it must be long enough for the defendant to have formed "the intent to kill," and "be fully conscious of that intent." *Id*.

Here, after tussling with his son outside the house, Frost went into the house and returned shortly thereafter carrying a gun. It was at that point, according to DJ, that Frost pointed the gun straight at him and fired. In deciding how the gun had been aimed, *i.e.,* either directly at DJ or in the air, the district court explicitly discredited Frost's testimony on the issue but found DJ's testimony fully credible – a dispositive conclusion that we cannot

overturn on appeal. *United States v. Maliszewski*, 161 F.3d 992, 1020 (6th Cir. 1998) ("[T]he district court's credibility findings are basically unassailable [on appeal]."). As a result, it seems apparent that in returning to the house specifically to retrieve the gun, Frost had sufficient time to form the intent to shoot DJ and to be "fully conscious of that intent." We therefore conclude that the district court did not err in applying the cross-reference to attempted murder.

## D. Acceptance of Responsibility

Finally, Frost challenges the district court's decision to deny him credit for acceptance of responsibility, a factual question that is reviewed for clear error. *United States v. Surratt*, 87 F.3d 814, 821 (6th Cir. 1996). We find no error in the decision in this case. Under USSG § 3E1.1 cmt. n.1, a defendant who "falsely denies . . . relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." Even if we were to agree with Frost that the district court erred in its finding that he falsely denied that he attempted to commit first degree murder, we conclude that the decision to deny credit for acceptance of responsibility is sustainable on an independent ground. At the suppression hearing, Frost admitted that he had attempted to persuade DJ and Linda Anderson to tell authorities that his gun actually belonged to them. This admission was the basis for the obstruction-of-justice enhancement Frost received at sentencing, and he did not appeal that enhancement. Significantly, defendants like Frost who receive enhancements for obstruction of justice are not considered eligible for acceptance-of-responsibility credit except in extraordinary cases. USSG § 3E1.1 cmt.

n.4. Moreover, it is well settled that the defendant has the burden of proving the extraordinary nature of the case. *United States v. Angel*, 355 F.3d 462, 477 (6th Cir. 2004). Frost, however, has provided no facts to suggest that his case fits within the narrow exception to the general rule barring defendants who obstruct justice from receiving credit for acceptance of responsibility. *See United States v. Gregory*, 315 F.3d 637, 640 (6th Cir. 2003) (noting that "'[c]ourts have employed an exacting standard to determine whether a defendant has accepted responsibility after having obstructed justice'" and that "[a]ppropriate considerations for determining whether a reduction is warranted include the defendant's truthful admission of the offense conduct, the defendant's voluntary assistance to authorities in resolving the offense, and the timeliness of the defendant's conduct in affirmatively accepting responsibility for his actions" (quoting *United States v. Williams*, 940 F.2d 176, 183 (6th Cir. 1991))). We thus conclude that Frost's challenge to the district court's denial of credit for acceptance of responsibility has no merit.

## CONCLUSION

For the reasons set out above, we AFFIRM the district court's judgment.

ROGERS, J., concurring and dissenting.

In my view, it was clearly erroneous to conclude that the defendant, in the circumstances of this case, attempted to commit a "willful, deliberate, malicious, and premeditated killing." 18 U.S.C. § 1111(a). The district court accordingly should not have applied the cross-reference to the attempted first-degree murder guideline, and resentencing is warranted. I concur in the other aspects of the majority opinion.