NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0166n.06

No. 20-1257

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Mar 30, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| NARRION LAMONT CASTON, | ) | MICHIGAN |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: CLAY, READLER, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. After a shooting victim arrived at a hospital with a bullet in his leg, the victim told a detective that Narrion Caston had shot him from his car when both had been stopped at an intersection. Hours later the police found shell casings in a car that Caston had borrowed from his mother and that matched the victim's description of the car from which Caston had fired the shots. Caston pleaded guilty to being a felon in possession of ammunition. Relying primarily on the victim's hearsay statements, the district court at sentencing found that Caston had attempted a murder with this ammunition. Caston now challenges the court's factual findings, which significantly increased his sentence. But district courts may use reliable hearsay at sentencing. And the district court's findings were at least a "plausible" reading of the sentencing record. Our deferential clear-error standard of review thus requires us to affirm.

I

Detective Ellen Larson works for the police department in Lansing, Michigan. On March 8, 2019, she was dispatched to a local hospital based on reports of a shooting victim. Upon her arrival, Larson noticed something unusual: A Dodge Durango was parked in the hospital's ambulance bay. The Durango, which turned out to be the victim's vehicle, had three bullet holes in the driver's side door and blood on the driver's seat. Larson went inside and learned that the victim, Deshawn Alexander, was undergoing a procedure to remove a bullet from his leg.

Larson interviewed Alexander in the emergency room after hospital personnel removed the bullet. Although sedated, in pain, and angry, Alexander was able to tell Larson what had happened. According to Larson, Alexander said that he was driving to visit his daughter earlier in the day. While stopped at an intersection just before getting onto a highway, Alexander heard a gunshot. He then heard a second shot and felt pain in his leg. Alexander told Larson that he looked to his left while these shots were firing. He saw Caston in a gray Pontiac Bonneville parallel to his Durango. Caston had been shooting with a semiautomatic handgun through the Bonneville's open passenger-side window. Once Alexander realized he had been shot, he turned to go to a nearby hospital. As he turned, he heard a third shot.

In addition to recounting these basic facts, Alexander explained to Detective Larson that he could recognize Caston as the shooter because they had known each other for a long time. The two had gone to middle school together and had been in a placement program for juveniles. Alexander also believed that the Bonneville belonged to Caston. He recalled that, when previously driving with the mother of Caston's child, they had seen the car and she had identified it as Caston's. Alexander also listed several places that Caston may have gone after the shooting,

including Caston's mother's home. Larson advised her law-enforcement colleagues to investigate Alexander's suggested locations.

When doing so, officers found a Bonneville fitting Alexander's description in front of the home of Caston's mother. The same night, Detective Larson traveled to this home to speak to his mother. It turns out that the Bonneville belonged to her. Caston's mother told Larson that her son had borrowed the car that day. She also consented to the police searching it. Detective Larson arranged for a crime-scene technician to come to the scene to search the car. He found two nine-millimeter shell casings in the Bonneville along with Caston's marriage certificate. One casing was found under the edge of the floor mat in the back seat on the driver's side. The other was found underneath a rear passenger-seat cushion. The police lab that later analyzed the shell casings concluded that they had been fired from the same weapon. It also concluded that the bullet removed from Alexander's leg was consistent with four possible calibers, including nine-millimeter.

The State of Michigan originally charged Caston with state-law crimes. Although under subpoena, Alexander failed to appear. The state thus dropped these charges. The United States next charged Caston with the federal crime of being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1). Caston pleaded guilty without a plea agreement.

When a district court calculates the offense level for a firearms offense under the Sentencing Guidelines, the relevant guideline instructs it to consider whether the defendant used the firearm or ammunition "in connection with the commission or attempted commission of another offense[.]" U.S.S.G. § 2K2.1(c)(1)(A). If so, the court must sometimes apply other guidelines to take account of that separate offense. *See id.* §§ 2K2.1(c)(1)(A), 2X1.1(a), (c)(1). Following these rules, Caston's presentence report recommended that the district court apply the

attempted-murder guideline (§ 2A2.1) on the ground that Caston had used the ammunition to assault Alexander with the intent to murder him. The report calculated Caston's base offense level as 27, *see id.* § 2A2.1(a)(2), a level significantly higher than the one that would apply under the firearms guideline alone. The report further recommended a two-level increase under the attempted-murder guideline because Alexander had "sustained serious bodily injury." *Id.* § 2A2.1(b)(1)(B).

Caston objected to the use of the attempted-murder guideline. He argued that insufficient evidence tied the two shell casings to the shooting and that, at the least, the evidence showed that he had committed only an aggravated assault, not an attempted murder. After Detective Larson testified at sentencing, the district court overruled both objections. The court found, by a preponderance of the evidence, that Caston had shot Alexander. Even though Alexander's statements to Detective Larson were hearsay, the court saw no evidence suggesting that Alexander had a motive to lie or could not recognize Caston. It added that Caston's mother had corroborated Alexander's account by confirming that Caston had borrowed her car. The court next found, again by a preponderance of the evidence, that Caston acted with the intent required for attempted murder. It reasoned that the shooting itself showed Caston's "malicious intent," as did the fact that one of the shots actually struck Alexander.

The district court's use of the attempted-murder guideline significantly increased Caston's guidelines range. The presentence report suggested that, without this cross-reference, the range would have been 37 to 46 months' imprisonment. With the cross-reference, the range became 110 to 120 months' imprisonment. After balancing the sentencing factors in 18 U.S.C. § 3553(a), the court sentenced Caston to 120 months' imprisonment—the statutory maximum sentence. *See* 18 U.S.C. § 924(a)(2).

II

Caston brings a procedural-reasonableness challenge to his sentence, arguing that the district court incorrectly calculated his guidelines range. *See United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018). The guideline for firearms offenses instructs district courts to apply a catch-all guideline for attempt offenses if a defendant used the specific firearm or ammunition underlying the defendant's conviction in connection with another crime:

> (1) If the defendant used or possessed any firearm or ammunition cited in the offense of conviction in connection with the commission or attempted commission of another offense, . . . apply—(A) § 2X1.1 (Attempt, Solicitation, or Conspiracy) in respect to that other offense, if the resulting offense level is greater than that determined above[.]

U.S.S.G. § 2K2.1(c)(1)(A). As relevant here, the referenced guideline (§ 2X1.1), in turn, indicates: "When an attempt, solicitation, or conspiracy is expressly covered by another offense guideline section, apply that guideline section." *Id.* § 2X1.1(c)(1). And another guideline (§ 2A2.1) expressly covers assault with intent to commit murder and attempted murder. *Id.* § 2A2.1; *see also United States v. Bradford*, 822 F. App'x 335, 338 (6th Cir. 2020); *United States v. James*, 575 F. App'x 588, 591–92 (6th Cir. 2014).

On appeal, Caston does not dispute that this attempted-murder guideline (§ 2A2.1) legally should apply if the government proved by a preponderance of the evidence that he intended to murder Alexander with the bullets whose shell casings were found in the Bonneville. *See United States v. Gates*, 461 F.3d 703, 708 (6th Cir. 2006). Caston instead challenges the district court's factual findings. He argues that the government failed to present enough evidence that he shot at Alexander and that the recovered shell casings were used in any such shooting. Alternatively, he argues that the evidence showed, at most, that he committed an aggravated assault, not an attempted murder. We will address each argument separately.

At the outset, though, both arguments share a common feature: They trigger a deferential standard of review. Although we review a district court's interpretation of the guidelines de novo, we review the court's findings about the historical facts (that is, about "who did what, when or where, how or why") only for clear error. *United States v. Thomas*, 933 F.3d 605, 608 (6th Cir. 2019) (quoting *U.S. Bank Nat'l Ass'n v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 966 (2018)). Under this clear-error standard, we must reject challenges to a factual finding as long as the finding is "plausible in light of the record viewed in its entirety[.]" *United States v. Viney*, 728 F. App'x 479, 482 (6th Cir. 2018) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)). That is the case even if enough evidence exists for the opposite finding and even if we would have made that opposite finding ourselves. *Id.* In other words, whenever conflicting evidence permits a district court to make two "permissible" findings, an appellate court must respect its choice of one finding over the other. *United States v. Frost*, 521 F. App'x 484, 491 (6th Cir. 2013) (quoting *Anderson*, 470 U.S. at 574); *see Cooper v. Harris*, 137 S. Ct. 1455, 1468 (2017).

The deferential nature of this inquiry is demonstrated by the many cases that have rejected similar factual claims. We have repeatedly held that a district court did not commit clear error when the court found that the defendant attempted a murder and thus triggered § 2K2.1(c)(1)'s cross-reference to the attempted-murder guideline. *See, e.g.*, *Bradford*, 822 F. App'x at 338–40; *Viney*, 728 F. App'x at 482–85; *United States v. Snowden*, 602 F. App'x 294, 296–97 (6th Cir. 2015); *James*, 575 F. App'x at 596–97; *United States v. Sanchez*, 527 F. App'x 488, 493 (6th Cir. 2013); *Frost*, 521 F. App'x at 490–92; *United States v. Dean*, 506 F. App'x 407, 409 (6th Cir. 2012); *United States v. Sanders*, 472 F. App'x 376, 381 (6th Cir. 2012); *United States v. Montgomery*, 412 F. App'x 856, 858–60 (6th Cir. 2011). In this case, too, neither of Caston's factual arguments can overcome the deferential clear-error standard.

A

Caston initially insists that the district court lacked sufficient evidence to find by a preponderance of the evidence that he shot at Alexander with the specific bullets whose casings were found in the Bonneville. But the government introduced enough evidence at sentencing for the district court's factual findings at least to be considered "plausible." *Viney*, 728 F. App'x at 482 (quoting *Anderson*, 470 U.S. at 574).

Start with Alexander's statements to Detective Larson. Larson testified that Alexander told her shortly after the shooting that he heard gunshots while in his car at an intersection. He turned to his left to see Caston firing at him through the passenger-side window in a car stopped parallel to his own. Alexander was struck by one of these shots. He also unambiguously identified Caston as the shooter because they had known each other since childhood. And Alexander identified the car that Caston had been driving as the gray Pontiac Bonneville that he believed Caston owned.

Turn to the corroboration of Alexander's hearsay. Alexander gave Larson several possibilities about where the police might find Caston. And the police ended up finding the car referenced by Alexander at one of these locations—the home of Caston's mother. The car matched the make, model, and color that Alexander had identified as the vehicle from which Caston had shot at him. Statements from Caston's mother provided further support. She confirmed for Detective Larson that Caston had borrowed this car at the time of the shooting.

Physical evidence offered even more corroboration. After all, Alexander went to the hospital with a bullet in his leg. His Durango also had three bullet holes in the driver's side door and blood on the driver's seat. Just hours after this shooting, moreover, the police discovered two nine-millimeter shell casings in the Bonneville from which Caston had allegedly fired the shots. A police lab later found that these casings had been shot from the same weapon. It also found that

the bullet removed from Alexander's leg was consistent with four possible calibers of ammunition, including the nine-millimeter casings in the car. All of this evidence suffices to make the district court's factual findings permissible and to withstand a clear-error challenge. *Cf. Bradford*, 822 F. App'x at 338–39; *Viney*, 728 F. App'x at 482–83.

Caston responds with two alleged deficiencies. *First*, he notes that Alexander did not testify; rather, Detective Larson testified about the statements that Alexander made to her at the hospital. But the district court did not commit reversible error by relying on this hearsay. "District courts routinely rely on hearsay for the factfinding part of a sentencing decision." *United States v. Armstrong*, 920 F.3d 395, 398 (6th Cir. 2019); *see, e.g.*, *United States v. West*, 962 F.3d 183, 188–89 (6th Cir. 2020); *United States v. Hunt*, 487 F.3d 347, 352–53 (6th Cir. 2007); *United States v. Davis*, 170 F.3d 617, 622 (6th Cir. 1999); *United States v. Silverman*, 976 F.2d 1502, 1511–13 (6th Cir. 1992) (en banc); *United States v. Miller*, 910 F.2d 1321, 1328 (6th Cir. 1990). In cases involving financial loss, for example, "loss amounts are commonly determined by testimony from a government agent who interviewed the victims." *United States v. Jones*, 817 F. App'x 138, 142 (6th Cir. 2020) (citing cases).

Courts may rely on hearsay at sentencing because the guidelines allow them to consider all "relevant information without regard to its admissibility under the rules of evidence" as long as the "information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). The Constitution also permits district courts to consider minimally reliable hearsay at sentencing. *See, e.g.*, *United States v. Katzopoulos*, 437 F.3d 569, 576 (6th Cir. 2006); *Silverman*, 976 F.2d at 1512–13. And we have described § 6A1.3(a)'s sufficient-indicia-of-reliability test as a "relatively low hurdle." *United States v. Johnson*, 732 F.3d 577, 583 (6th Cir. 2013). Even statements from "unidentified sources" can meet the test if sufficient corroboration exists.

8

*Silverman*, 976 F.2d at 1513; *see, e.g.*, *Armstrong*, 920 F.3d at 398. Once the district court concludes that hearsay is sufficiently reliable, moreover, we will review its reliability determination under the same deferential clear-error standard. *See Armstrong*, 920 F.3d at 399.

When measured against these rules, the district court did not clearly err in finding that Alexander's hearsay statements contained enough indicia of reliability. The statements were detailed. *Cf. United States v. Moncivais*, 492 F.3d 652, 659 (6th Cir. 2007). Unlike with, say, statements from coconspirators, Caston also identifies no evidence suggesting that Alexander had a motive to lie about who shot him. *Cf. Hunt*, 487 F.3d at 352. Nor does Caston identify any evidence suggesting that Alexander would have had trouble identifying the shooter. And, as noted, the police corroborated many elements of Alexander's story with physical evidence and statements from Caston's mother.

Against all this, Caston argues that Alexander's statements lacked even minimal reliability because he never made them under oath—whether in the state criminal case or later at the federal sentencing. But, by definition, a hearsay declarant will not testify at the federal sentencing— hence, the need to rely on the hearsay. And, as the district court said about Alexander's failure to appear in state court, maybe "he was intimidated" since "he had been shot once." Despite Alexander's failure to testify, the district court could permissibly conclude that his statements had at least "*some* evidentiary basis[.]" *Armstrong*, 920 F.3d at 398 (quoting *Silverman*, 976 F.2d at 1504). The court thus could rely on them.

*Second*, Caston offers reasons why the shell casings discovered in the Bonneville (and on which the government based his felon-in-possession conviction) might not have come from the specific bullets used to shoot at Alexander. Caston is right that, to trigger the cross-reference to the attempted-murder guideline, he must have used the *specific* ammunition underlying his

"offense of conviction" in the attempted murder. U.S.S.G. § 2K2.1(c)(1)(A). In 2014, the Sentencing Commission amended § 2K2.1(c)(1) to require this connection between the firearm or ammunition underlying the conviction and the separate crime. *See* 79 Fed. Reg. 25996, 26006–07 (May 6, 2014). (This fact differentiates § 2K2.1(c)(1) from a related enhancement that can apply if the defendant used "any" firearm or ammunition in connection with another crime. U.S.S.G. § 2K2.1(b)(6); *see United States v. Howse*, 478 F.3d 729, 733 (6th Cir. 2007).)

Caston is wrong, however, to suggest that the district court could not plausibly find that these shell casings came from the ammunition used to shoot at Alexander. He notes that the bullet removed from Alexander's leg was consistent with three other calibers, not just the nine-millimeter casings in the car. Relying on the facts in his presentence report, he also argues that the location of the two shell casings—one beneath the floormat of a rear passenger seat and the other under the seat's cushion—suggests that they had been in the Bonneville for longer than a few hours. Caston also alleges that the backseat contained a lot of trash and that the shell casings would have needed to go through some debris to land where they did.

But his factual theory (that the shell casings were from another shooting) cannot overcome the standard of review. Even if his theory is "marginally plausible," that fact would not make "the district judge's alternative interpretation clearly erroneous." *Frost*, 521 F. App'x at 491. "[T]he very premise of clear error review is that there are often 'two permissible'—because two 'plausible'—'views of the evidence.'" *Cooper*, 137 S. Ct. at 1468 (quoting *Anderson*, 470 U.S. at 574). And Caston's arguments ignore all of the other evidence suggesting that the shell casings came from the shooting of Alexander. Alexander made clear that Caston had shot at him from this Bonneville. And the car was searched only hours after this shooting. Caston also presented no evidence to support his bare assertion that the shell casings' location conflicted with their having

10

been discharged from the shooting of Alexander. In that regard, while Caston relies on parts of the presentence report to support this theory, he ignores other parts. As the report noted in response to his objection: "The location of the recovered ammunition cartridges is consistent with the discharge of a semiautomatic handgun from the front seat of a vehicle given this type of firearm ejects spent ammunition cartridges from the right side." All told, the district court could find it unlikely that the Bonneville would just so happen to have casings from some other shooting, but not the casings from the shooting that occurred hours earlier.

B

Caston alternatively argues that the district court should have applied the aggravated-assault guideline because the court lacked enough evidence to find an essential element for the attempted-murder guideline: that he harbored the intent to kill Alexander. Here again, however, the district court's finding that Caston acted with the required intent was at least "plausible" based on the evidence presented. *Viney*, 728 F. App'x at 482 (quoting *Anderson*, 470 U.S. at 574). That conclusion forecloses Caston's factual claim.

The attempted-murder guideline imposes a base offense level of 33 if the offense would have been first-degree murder under the federal murder statute (18 U.S.C. § 1111) and "otherwise" imposes a base offense level of 27 for all other types of attempted murders or assaults with intent to commit murder (whether under federal or state law). U.S.S.G. § 2A2.1(a)(1)–(2) & cmt. n.1. First-degree murder and second-degree murder under federal law both require "malice aforethought." 18 U.S.C. § 1111(a). This common-law term can be satisfied not just by intentional killings but also by certain *reckless* killings showing a "depraved heart." *See, e.g.*, *United States v. Turner*, 436 F. App'x 631, 631 (6th Cir. 2011); *see also* 2 Wayne R. LaFave, *Substantive Criminal Law* §§ 14.1, 14.4 (3d ed.), Westlaw (databased updated Oct. 2020). The recklessness

11

sufficient for a murder can exist "[w]hen a defendant grossly deviates from the standard of care to such an extent that a jury could conclude that he must have been aware of a serious risk of death or serious bodily injury[.]" *United States v. Sheffey*, 57 F.3d 1419, 1430 (6th Cir. 1995); *see United States v. Milton*, 27 F.3d 203, 206 (6th Cir. 1994).

An attempt offense, however, requires the *intent* to commit the crime (along with an overt act towards its commission). *See United States v. Wesley*, 417 F.3d 612, 618 (6th Cir. 2005). This difference in *mens rea* between an attempted murder and a murder means that, "[a]lthough a murder may be committed without an intent to kill, an attempt to commit murder requires a specific intent to kill." *Braxton v. United States*, 500 U.S. 344, 351 n.* (1991) (quoting 4 Charles E. Torcia, *Wharton's Criminal Law* § 743, at 572 (14th ed. 1981)). (The government makes no claim that the intent element is different under Michigan law for an assault with intent to commit murder. *See People v. Taylor*, 375 N.W.2d 1, 7 (Mich. 1985) (per curiam); *cf. Turner*, 436 F. App'x at 631.) Caston is thus correct that the attempted-murder guideline required the government to present enough evidence that Caston intended to kill Alexander. *See James*, 575 F. App'x at 596. Acting with a recklessly "depraved heart" does not suffice. *See Turner*, 436 F. App'x at 631.

Yet the evidence permitted the district court to find this required intent. As we explained when upholding a finding that a defendant committed first-degree murder (which requires an additional element): "We have previously found that specific intent to kill could be inferred from a defendant firing a gun aimed at an individual." *Bradford*, 822 F. App'x at 339. Indeed, we have upheld a district court's finding of the intent to kill based solely on the fact that the defendant shot in the victim's direction such that the bullet could have struck him. *James*, 575 F. App'x at 590, 596–97; *see also Viney*, 728 F. App'x at 484; *Frost*, 521 F. App'x at 491. If anything, this case is easier. The evidence showed that Caston shot into Alexander's car three times, even hitting him

with one shot. As the district court concluded, this evidence supports a finding that he harbored the "malicious intent" required for attempted murder or assault with intent to commit murder.

Caston responds that the evidence shows that he intended only to scare Alexander because the bullet holes in Alexander's Durango were in the driver's side door, not in the driver's side window. But, as we have repeatedly reasoned in response to similar claims, Caston "has offered only a competing view of the evidence; he has not demonstrated that his view of the evidence is the *only* view." *Bradford*, 822 F. App'x at 339; *see also Viney*, 728 F. App'x at 485; *Frost*, 521 F. App'x at 491; *Sanders*, 472 F. App'x at 382. It is not.

Caston also cites *United States v. Morgan*, 687 F.3d 688 (6th Cir. 2012). There, we held that the district court found as a fact only that the defendant "'had the ability to form the intent' to kill," not that he had "actually formed that intent." *Id.* at 697. We thus remanded for further fact-finding on this intent element. *Id.* Here, by contrast, Caston makes no claim that the district court failed to find that he acted with the required intent. He challenges only the evidentiary support for that required factual finding. *See Viney*, 728 F. App'x at 484.

One last point. Relying on *Milton* (another case involving a shooting into a car), the government suggests that it could prove attempted murder simply by proving the recklessness that suffices to show "malice aforethought." *See Milton*, 27 F.3d at 206–07. It is mistaken. *Milton* did not involve an *attempted* murder; it involved the *substantive* offense of second-degree murder under 18 U.S.C. § 1111. *See id.* *Milton* held that a defendant can commit a murder with malice aforethought under § 1111 even by acting recklessly (such as with "an *extreme* disregard for human life"). *See Sheffey*, 57 F.3d at 1430. For attempted murder, by contrast, the government must prove that the defendant harbored the specific intent to kill the victim. *See Braxton*, 500 U.S. at 351 n.*; *James*, 575 F. App'x at 596. One cannot intend to commit a reckless "depraved heart"

murder.  *See Turner*, 436 F. App'x at 631.  But Caston makes no claim that the district court applied the wrong legal standard.  And the evidence permitted the factual finding that he acted with the intent to kill Alexander.

We thus affirm.